FILED
United States Court of Appeals
Tenth Circuit

August 5, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUDAH PRINCE, also known as Rex
A. Lutes,

Defendant-Appellant.

No. 10-3180

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 6:09-CR-10008-1-JTM)**

---

Timothy J. Henry, Assistant Federal Public Defender, Federal Public Defender
Office, Wichita, Kansas, for Appellant.

James A. Brown, Assistant United States Attorney (Barry R. Grissom, United
States Attorney, and Matt Treaster, Assistant United States Attorney, with him on
the brief) United States Attorney's Office, Wichita, Kansas, for Appellee.

---

Before **TYMKOVICH**, **SEYMOUR**, and **ANDERSON**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Appealing his drug convictions, Judah Prince asks us to decide two

questions of first impression in our circuit. First, does the Constitution bar the

government from peremptorily striking prospective jurors because of their views on marijuana legalization? On this question, we find no constitutional protection. Given the posture of Prince's case, the Constitution does not prohibit parties from striking jurors on this basis.

The second question is whether a conviction under 18 U.S.C. § 924(a)(1)(A), which criminalizes making false statements to federally licensed firearms dealers, requires a defendant to know that his false statement will be kept in the firearm dealer's written records, as mandated by federal law. Because the records-keeping requirement is purely a jurisdictional element, we hold there is no such *mens rea* requirement.

Accordingly, we reject Prince's arguments on these two points. And, after a careful consideration of the record, we also reject Prince's challenges to the sufficiency of the evidence and his sentence. Therefore, exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we AFFIRM Prince's conviction and sentence.

## I. Background

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) originally identified Prince in connection with an investigation into illegal sales of firearm parts. The ATF suspected an individual had been manufacturing and illegally selling AK-47 "flats" on GunBroker.com, and it traced one of the sales to Prince. Investigating further, ATF agents ultimately discovered that Prince had made

more than 150 purchases from GunBroker.com, including AK-47 assault rifles, fully automatic trigger parts, demilled fully automatic weapons, and Uzis. [R., Vol. II at 354–55.] In connection with their inquiries, ATF agents questioned a firearms dealer who handled transactions for Prince. The dealer alerted Prince to the investigation.

When ATF agents located Prince, he admitted to buying the guns and gun parts and agreed to show the agents his purchases, which he kept in his garage. At Prince's Newton, Kansas residence, the agents saw various gun parts and ammunition, and they obtained a warrant to search the house. Soon thereafter, the agents encountered Prince's adult children, who often stayed at the residence. Upon searching the house, the agents found 54 firearms and approximately 10,000 rounds of ammunition. But that was not all. They also found more than 200 marijuana plants in the basement and evidence that suggested Prince was involved in their cultivation.[1] Finally, the ATF discovered Prince had repeatedly given a false address to federally licensed firearms dealers.

The government charged Prince with one count of manufacturing marijuana plants, 25 counts of making false statements to a federally licensed firearms dealer, and one count of unlawful use of a controlled substance while possessing a firearm. 21 U.S.C. § 841(a)(1) (count 1); 18 U.S.C. § 924(a)(1)(A) (counts

---

[1] When officers first uncovered evidence of the marijuana in the house, they obtained a second search warrant for the marijuana growing operation.

2–26); 18 U.S.C. §§ 922(b)(3), 924(a)(2) (count 27). Prince pleaded not guilty. Before trial, the district court granted Prince's motion to suppress evidence seized by the government during a search of his residence, and the court also *sua sponte* ordered suppression of all evidence obtained by the government from the inception of its investigation of Prince. The government appealed, and we reversed the district court and remanded for trial. *See United States v. Prince*, 593 F.3d 1178 (10th Cir. 2010), *cert. denied*, 130 S. Ct. 3429 (2010).

After trial, the jury convicted Prince of the marijuana manufacturing count and the twenty-five false statement counts. He was acquitted of unlawfully using a controlled substance while possessing a firearm. Pursuant to 21 U.S.C. § 841(b)(1)(B), Prince was subject to a mandatory minimum sentence of ten years' imprisonment; this included a mandatory five-year enhancement tied to a prior felony drug conviction for growing marijuana. Accordingly, the district court sentenced Prince to the mandatory minimum ten years' imprisonment.

## II. Discussion

Prince contends (1) the district court erred in allowing the government to strike jurors for their belief that marijuana should be legalized, (2) the jury instructions were based on a misinterpretation of § 924(a)(1)(A), (3) the evidence was insufficient to support his conviction, and (4) the district court issued an improper sentence. After thoroughly reviewing the record, we conclude these arguments lack merit.

### A.    *Jury Selection*

Prince raises two challenges to the district court's administration of jury selection.  First, relying on *Batson v. Kentucky*, 476 U.S. 79 (1986), he contends the government's peremptory challenges, which eliminated jurors who favored legalization of marijuana, infringed his rights under the Equal Protection Clause of the Fourteenth Amendment.  Second, he argues his Sixth Amendment rights were violated because the empaneled jury was not drawn from a fair cross-section of the community.[2]  Neither assertion is persuasive.

### *1.* Batson *Challenge*

During jury selection, the government asked potential jurors whether they believed marijuana should be legalized.  Four prospective jurors answered "yes." Later, over Prince's objection, the government used peremptory strikes to remove each of these prospective jurors.

Prince contends this was an equal protection violation under *Batson*.  He says that because the government may not strike jurors on the basis of their race, it also may not strike jurors on the basis of political or ideological beliefs. Specifically, Prince asks us to extend *Batson*—which traditionally has been

---

[2]  Prince also challenges jury selection on Fifth Amendment grounds and on the theory that he did not receive a fair trial.  We need not consider these arguments at length.  Prince's Fifth Amendment claim relies entirely on his *Batson* equal protection claim and has no independent merit.  Similarly, Prince's contention he was deprived of the right to a fair trial restates his Sixth Amendment fair cross-section claim.

applied only to peremptory strikes based on race and other protected classes under the Fourteenth Amendment—to prohibit exclusions of prospective jurors based on their views of marijuana legalization.

We resist this invitation. Prince's *Batson* challenge fails because, as a matter of law, *Batson* does not extend to the exclusion of jurors based on their beliefs regarding marijuana legalization. A brief review of the Supreme Court's reasoning explains why. In *Batson*, the Supreme Court held the "Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89. Lodging a successful *Batson* challenge requires three steps:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, [i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (citations and quotations omitted). In assessing an equal protection claim under this test, we review "for clear error the district court's finding of whether the striking party had discriminatory intent." *United States v. Castorena-Jaime*, 285 F.3d 916, 927 (10th Cir. 2002). In doing so, we "afford[] great deference to [the district

court's] decision on discriminatory intent, which represents a finding of fact." *Id.* We review de novo whether the government's proffered explanation for striking the jurors was appropriate. *United States v. Smith*, 534 F.3d 1211, 1226 (10th Cir. 2008). "[T]he ultimate burden of persuasion," however, "regarding [improper] motivation rests with, and never shifts from" the party opposing the strike. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).

Prince cannot get past the first step of the *Batson* analysis. *Batson* originally addressed only peremptory strikes based on race, but the principle has subsequently been extended to other groups receiving heightened protection under the Fourteenth Amendment. *See, e.g.*, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 (1994) (applying *Batson* to sex); *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) (applying *Batson* to strikes against Native Americans); *United States v. Brown*, 352 F.3d 654, 666 (2d Cir. 2003) (applying *Batson* to religious affiliation); *United States v. Rudas*, 905 F.2d 38 (2d Cir. 1990) (applying *Batson* to strikes against Hispanics). There is no precedent, however, for extending *Batson* to exclusions based on the beliefs of prospective jurors. And in fact, every court we could find has expressly refused to extend *Batson* beyond these traditional limits. *See, e.g.*, *United States v. DeJesus*, 347 F.3d 500, 511 (3d Cir. 2003) ("The distinction drawn by the District Court between a strike motivated by religious beliefs and one motivated by religious affiliation is valid and proper."); *United States v. Stafford,* 136 F.3d 1109, 1114 (7th Cir. 1998) ("It would be

improper and perhaps unconstitutional to strike a juror on the basis of his being a Catholic, a Jew, [or] a Muslim," but it would be "proper to strike him on the basis of a belief that would prevent him from basing his decision on the evidence and instructions, even if the belief had a religious backing."); *United States v. Villarreal*, 963 F.2d 725, 729 (5th Cir. 1992) ("Political belief is not the overt and immutable characteristic that race is, and we decline to extend the *Batson* line of cases to this case.").

This position makes sense. Equal Protection Clause jurisprudence dictates that jurors should not be stricken solely on account of race, ethnicity, or sex. Allowing status-based strikes of jurors in classes receiving heightened protection under the Fourteenth Amendment interferes inextricably with a defendant's constitutional right to an impartial jury. The fact that a prospective juror is a certain race or sex is not determinative of his ability to be a dispassionate fact-finder. On the other hand, a person's policy views or ideological perspectives on a particular issue may introduce bias and impair a juror's ability to be impartial. In this vein, there are times when striking jurors based on their prejudicial beliefs facilitates disinterested factfinding.

We also note that under *Batson*, a significant part of the harm we seek to avoid by prohibiting certain discriminatory strikes is the harm to the community at large and to the excluded jurors. It is not only the defendant who is harmed by unconstitutional discrimination during voir dire. Excluding certain persons from

-8-

jury service "solely by reason of their race . . . forecloses a significant opportunity to participate in civic life." *Powers v. Ohio*, 499 U.S. 400, 409 (1991); *see also J.E.B.*, 511 U.S. at 140 ("Discrimination in jury selection . . . causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process.").

Hence, there is a sharp distinction between one's status in a protected class and one's views on marijuana legalization. As the Supreme Court has explained in a different context, it may be appropriate for a party to "use peremptory challenges to eliminate prospective jurors belonging to groups it believes would unduly favor the other side." *Holland v. Illinois*, 493 U.S. 474, 481 (1990). The Court emphasized that the use of peremptory challenges is "a means of eliminat[ing] extremes of partiality on both sides, thereby assuring the selection of a qualified *and unbiased* jury."[3] *Id.* at 484 (quoting *Batson*, 476 U.S. at 91)

---

[3] In *United States v. DeJesus*, 347 F.3d at 511, the Third Circuit highlighted this principle when it held that a district court's differentiation "between a strike motivated by religious beliefs and one motivated by religious affiliation [was] valid and proper." The court explained that a prosecutor "may undoubtedly strike a juror for being unwilling to sit in judgment of another human being," but he may not "infer solely from a prospective juror's race, gender or religion that he will be unwilling to sit in judgment of another, and then offer that unwillingness as a permissible basis for a peremptory challenge." *Id.* at 514; *see also* Wayne R. LaFave et al., *Criminal Procedure* § 22.3(d) (2010) ("Lower courts have divided over whether the *Batson* principle prohibits challenges based on religion, with the better view banning challenges based on membership alone but allowing challenges based on activities or articulated beliefs."). We need not decide here whether peremptory strikes on the basis of religious affiliation are constitutionally improper, but we agree with the principle that striking a juror for

(continued...)

(quotation marks omitted).  For these reasons, we agree with those courts that decline to expand *Batson* to cover discrimination based on political or ideological viewpoints.  *See generally* Wayne R. LaFave et al., *Criminal Procedure* § 22.3(d) (2010).

Prince's citation to other authority is unpersuasive.  Prince cites both *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and *Adams v. Texas*, 448 U.S. 38 (1980), for the proposition that prospective jurors cannot be excluded solely on the basis their beliefs.  Both of these cases, however, "dealt with the special context of capital sentencing, where the range of jury discretion necessarily gave rise to far greater concern over the possible effects of an 'imbalanced' jury." *Lockhart v. McCree*, 476 U.S. 162, 182 (1986).

In *Witherspoon*, the Supreme Court held narrowly that the death penalty cannot be imposed by a jury where prospective jurors were excluded "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."  391 U.S. at 522.  The Court has never extended this doctrine beyond the death penalty context.  Moreover, the Court expressly rejected the notion that "the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction."  *Id.* at 518.  It is therefore

[3](...continued)
his beliefs is categorically different from striking him because of his status in a protected class.

apparent that the *Witherspoon* restriction applies only to the sentencing phase of a trial—and not the guilt phase.

The story was the same in *Adams v. Texas*, where the Supreme Court struck down a Texas statute that required jurors in capital cases to swear that the prospect of a mandatory death penalty "would not affect their deliberations on any issue of fact." 448 U.S. at 42. The Court reasoned that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties . . . ." *Id.* at 45.

Since these cases, the Supreme Court has squarely limited the doctrine set forth in *Witherspoon* and *Adams* by expressly rejecting the "suggestion that [the two cases] have broad applicability outside the special context of capital sentencing . . . ." *Lockhart*, 476 U.S. at 183. Accordingly, they are inapplicable here. In the *Batson* context, death is indeed different. For these reasons, Prince's *Batson* challenge is meritless.

### 2. *Fair Cross-Section Challenge*

Prince's Sixth Amendment argument parallels his equal protection claim. He contends the exclusion of pro-marijuana-legalization jurors from the petit jury violated his right to have an impartial jury drawn from a fair cross-section of the community. This claim also fails.

-11-

First, the Sixth Amendment right to a jury representative of a fair cross-section of the community applies only to the jury pool—not to the petit jury. This alone is fatal to Prince's argument, because he challenges only the composition of the petit jury. In general, criminal defendants have a Sixth Amendment right to "object to a venire that is not designed to represent a fair cross section of the community, whether or not the systematically excluded groups are groups to which he himself belongs." *Holland*, 493 U.S. at 477. In *Lockhart v. McCree*, 476 U.S. at 173–74, the Supreme Court held that this fair-cross-section requirement does not extend to petit juries—as opposed to jury panels or venires—and therefore does not prohibit the appropriate use of for-cause and peremptory challenges against prospective jurors. The court noted the "practical impossibility of providing each criminal defendant with a truly 'representative' petit jury." *Id.* at 174. Further, even if we were to assume the fair-cross-section requirement could apply to petit juries, it certainly would not apply to non-distinctive groups identified only in terms of shared beliefs, such as support for marijuana legalization. As the Court stated in *Lockhart*, any requirement that jurors should hold a discrete mix of viewpoints is "both illogical and hopelessly impractical." 476 U.S. at 178. The use of peremptory challenges to eliminate jurors belonging to groups that might unduly favor one side or the other is a long and accepted practice in common-law jurisdictions.

-12-

Prince's claim fails for another reason as well: the fair-cross-section principle does not apply to peremptory strikes. In *Holland v. Illinois*, 493 U.S. at 478, the Supreme Court held that "[a] prohibition upon the exclusion of cognizable groups through peremptory challenges has no conceivable basis in the text of the Sixth Amendment, is without support in our prior decisions, and would undermine rather than further the constitutional guarantee of an impartial jury." The Court reasoned that the Sixth Amendment assured the prospect of an *impartial* jury but not necessarily a *representative* jury. *Id.* at 480; *see also House v. Hatch*, 527 F.3d 1010, 1026 (10th Cir. 2008).

Ultimately, the fair-cross-section doctrine does not suggest that an impartial jury must be composed of individuals with diverse opinions or ideologies. The Supreme Court has held that "any [] group[s] defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case . . . may be excluded from jury service without contravening any basic objectives of the fair-cross-section requirement." *Lockhart*, 476 U.S. at 176–77. This is because "[t]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Id.* at 184.

-13-

Thus, Prince suffered no Sixth Amendment violation. He cannot escape the fact that the fair-cross-section doctrine applies neither to petit juries nor to peremptory strikes. It was therefore constitutionally appropriate for the district court to empanel a jury devoid of jurors who favor legalization of marijuana.

### B. Jury Instructions

Prince also argues his conviction under § 924(a)(1) for making false statements in connection with purchasing firearms should be overturned because the district court failed to instruct the jury about the proper *mens rea* of an element of the crime.[4] Specifically, he asserts the government had to prove not only that he knowingly made false statements on ATF forms, but also that he knew the false information would be kept in the records of a federally licensed firearms dealer. He is incorrect.

We "review de novo the jury instructions as a whole and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *United States v. Bedford*, 536 F.3d

---

[4] In his opening brief, Prince advanced an additional *mens rea* argument, which addressed the statutory construction of the marijuana manufacturing statute. He contended the government had to prove he not only knowingly or intentionally manufactured marijuana plants, but also that he knew the amount he manufactured exceeded 100 plants. *See* § 841(a)(1). Prince subsequently withdrew this argument, because in Jury Instruction Number 11, the Court required the jury to find that Prince "knew the amount of the controlled substance he manufactured was at least 100 plants." R., Vol. 1 at 105. Therefore, we need not address this issue.

1148, 1152 (10th Cir. 2008) (quotation omitted). We "review the district court's decision to give or to refuse a particular jury instruction for abuse of discretion." *Id.* Ordinarily, "[f]ailure to instruct on such an essential element as intent or knowledge requires reversal." *United States v. Laughlin*, 26 F.3d 1523, 1527 (10th Cir. 1994).

Section 924(a)(1) provides that "whoever—(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter . . . shall be fined under this title, imprisoned not more than five years, or both." Under this statute, it is self-evident that a defendant may not be convicted unless the government shows he knowingly made a false statement. An unwitting misrepresentation does not suffice. The question is whether the "knowingly" *mens rea* term also modifies § 924(a)(1)(A)'s object: "to be kept in the records of a person licensed under this chapter." In other words, to be criminally liable, must a defendant making a knowing misrepresentation also know that the firearms dealer will keep the statement in his records, as required by federal law? The district court thought not, and we agree.

In Jury Instruction Number 12, the court explained the elements of § 924(a)(1)(A) but, over Prince's objection, did not state that Prince's conviction depended on his knowledge of the statute's records provision. Instruction Number 12 required the jury to find:

| | |
|---|---|
| *First*: | the person named in the indictment was a Federally licensed firearms dealer at the time the alleged offense occurred; |
| *Second*: | the defendant made a false statement or representation in the firearm records that the licensed firearms dealer was required by federal law to maintain; and |
| *Third* | the defendant made the false statement or representation with knowledge of the falsity. |

Prince claims this instruction was erroneous in light of *Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009), which addresses the grammatical construction of the term "knowingly" in an aggravated identity-theft prosecution under 18 U.S.C. § 1028A(a)(1). Prince argues the logic in *Flores-Figueroa* applies to § 924(a)(1) and requires us to reverse the district court.

In *Flores-Figueroa*, the Supreme Court interpreted § 1028A(a)(1)—a statute unrelated to the one at issue in the present case—which criminalizes "knowingly transfer[ing], possess[ing], or us[ing], without lawful authority, a means of identification of another person." The Court considered whether the "knowingly" *mens rea* element modified the sentence's direct object: "a means of identification of another person." 129 S. Ct. at 1894. The question was whether a defendant could be convicted of aggravated identity theft regardless of whether he actually knew his fake documentation belonged to someone else.[5]

---

[5] The facts of *Flores-Figueroa* illustrate the crux of the issue. Flores-Figueroa was a Mexican citizen who obtained counterfeit identification

(continued...)

According to the Court, "[a]s a matter of ordinary English grammar," the word "knowingly" in § 1028A(a)(1) applies to each subsequently listed element in the crime. *Id.* at 1890. Under this interpretation, "knowingly" modifies not only the verbs of the sentence, but also the direct object. Relying on this logic, Prince contends we should apply the "knowingly" *mens rea* term to all elements of § 924(a)(1)(A), including the direct object: "to be kept in the records of a person licensed under this chapter." This argument has some force. Just like in *Flores-Figueroa*, here we have only a single sentence, in a single subsection, addressing a single subject matter. Nevertheless, we find the argument unconvincing.

Unlike the direct object at issue in *Flores-Figueroa*, § 924(a)(1)(A)'s records requirement is simply a jurisdictional hook. It provides authority for the United States to criminalize false statements made to firearms dealers. Indeed, although it affects the consequences of knowingly lying to firearms dealers—the conduct Congress sought to punish—it does not bear on the nefariousness of the conduct itself. Accordingly, the status of firearms dealers and the forms they must keep on file are not separate knowledge elements under § 924(a)(1)(A) but

---

[5](...continued)
documents for employment purposes. He initially received documents reflecting fabricated Social Security numbers and alien registration numbers. Later, however, he received new documents with new numbers that, unlike his initial documentation, actually belonged to other people. At trial, the government successfully argued it was of no consequence whether Flores-Figueroa knew that his second set of documents was a "a means of identification of another person." 129 S. Ct. at 1888–89. The Supreme Court disagreed and applied § 1028A(a)(1)'s "knowingly" requirement to each term of the provision.

rather objective facts that must be established before the statute can apply.  In the absence of clear language, we therefore decline to read a *mens rea* requirement into § 924(a)(1)(A)'s record-keeping provision.

This holding accords with our consistent instruction that "knowledge of [] jurisdictional facts is not generally an element of the required intent under federal statutes."[6]  *United States v. Speir*, 564 F.2d 934, 938 (10th Cir. 1977); *see also United States v. Ransom*, 642 F.3d 1285, 1289 n.3 (10th Cir. 2011) (under 18 U.S.C. § 641); *United States v. Quarrell*, 310 F.3d 664, 673–74 (10th Cir. 2002) (under 16 U.S.C. § 470ee(a)); *United States v. Levine*, 41 F.3d 607, 617 n.12 (10th Cir. 1994) (under 18 U.S.C. § 1365(b)); *United States v. Montoya*, 716 F.2d 1340 (10th Cir. 1983) (under 18 U.S.C. § 287); *United States v. Balano*, 618 F.2d 624, 630 (10th Cir. 1979) ("We do not require the government to prove the defendant's knowledge of jurisdictional elements.").

Our approach here is not inconsistent with *Flores-Figueroa* or other relevant precedents.  Most importantly, neither *Flores-Figueroa* nor *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994)—the other main case Prince relies on—involved purely jurisdictional direct objects.  For example, in the statute at

---

[6] Our approach accords with that of other circuits.  *See, e.g.*, *United States v. Rehak*, 589 F.3d 965, 974 (8th Cir. 2009) ("[T]he government is not required to prove a defendant knew the property he stole was owned by the United States because the United States' ownership merely provides the basis for federal jurisdiction."); *United States v. Brandon*, 17 F.3d 409, 425–27 (1st Cir. 1994) (in a similarly constructed statute, the "knowingly" *mens rea* term did not apply to a jurisdictional direct object).

issue in *Flores-Figueroa*, the focus was on whether the means of identification belonged to another person. 129 S. Ct. at 1890–92. In that context, no doubt exists that absconding with someone else's identity—and in doing so, impersonating an innocent and unaware citizen, most likely to his detriment—implicates additional harm beyond the crime of simply using a falsified identification document.[7]

Similarly, in the statute at issue in *X-Citement Video*, the object of the *mens rea* term involves the age of the subject of a pornographic image. 513 U.S. at 67–69; *see also* 18 U.S.C. § 2252. In that context, knowingly distributing child pornography is certainly worse than distributing obscene images depicting someone assumed (albeit mistakenly) to be over the age of 18. In contrast, in no way is making a false statement to a gun seller rendered more condemnable if the defendant knew the misrepresentation was required by law to be kept in the records of a federally licensed firearms dealer. In this sense, declining to apply § 924(a)(1)(A)'s "knowingly" modifier to the sentence's direct object creates no danger of criminalizing otherwise innocent conduct. *See Liparota v. United States*, 471 U.S. 419, 426 (1985) (noting *mens rea* terms are "particularly appropriate where . . . to interpret the statute [more broadly] would be to

---

[7] This is likely why Congress chose to define separate offenses and punishments for identity *theft* (§ 1028A), on the one hand, and identity *fraud* (18 U.S.C. § 1028), on the other. *See Flores-Figueroa*, 129 S. Ct. at 1893 (recognizing the distinction between these two statutes).

criminalize a broad range of apparently innocent conduct"); *see also X-Citement Video, Inc.*, 513 U.S. at 73 ("[T]he presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct."). Indeed, the direct object of § 924(a)(1)(A) is purely jurisdictional and involves no conduct at all.

For these reasons, the jury instructions accurately stated the governing law.

### C. *Sufficiency of the Evidence*

Next, Prince argues the evidence was insufficient to support his conviction. Specifically, he contends the jury heard insufficient evidence that he knowingly gave false information to a federally licensed firearms dealer, and that the record does not reflect his personal involvement in the marijuana cultivation enterprise. After a thorough review of the record, we disagree on both points.

We review sufficiency of the evidence de novo. *United States v. Parker*, 553 F.3d 1309, 1316 (10th Cir. 2009). Under due process principles, evidence is sufficient to support a conviction if, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the government, a rational trier of fact could find guilt beyond a reasonable doubt. *Id.*; *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury." *United States v. Summers*, 414 F.3d 1287, 1293 (10th Cir. 2005).

*1. False Statements to Firearms Dealers*

The facts underlying this issue are simple. Despite apparently residing at one residence in Newton at all relevant times to the crimes charged, Prince routinely purchased firearms using a different address—in another part of town—that was listed on his driver's license. This was a problem for Prince because ATF inquiries revealed he had never lived at the driver's license address.

As explained above, to prove liability under § 924(a)(1)(A), the government had to establish three elements: (1) the dealers named in the indictment were federally licensed firearms dealers at the time the offenses occurred; (2) Prince made a false statement or representation in the records that the licensed firearm dealer was required by federal law to maintain; and (3) he made the false statement with knowledge of the falsity. *See* Jury Instruction No. 12. Prince argues the address information was immaterial, and therefore irrelevant, to the requirements of § 924(a)(1)(A), and that in any event, the government did not prove he used a false address when buying firearms. The voluminous evidence in the record belies Prince's contentions.

As an initial matter, we hold that knowingly giving a false address when filling out ATF forms violates § 924(a)(1)(A). ATF Form 4473, which federally licensed firearms dealers must keep on file, requires a firearm purchaser to provide his "current residence address"—an out-of-date address listed on a driver's license would not suffice—and warns that the buyer's current residential

address cannot be a post office box. *See, e.g.*, Supp. R., Gov't Ex. 2F; *see also United States v. Nelson*, 221 F.3d 1206, 1209 (11th Cir. 2000) (18 U.S.C. § 922(b)(5) requires licensed firearms dealers to keep records containing information about purchasers, including name, age, and place of residence; as a result, false statements relating to this information are prohibited under § 924(a)(1)(A)). Additionally, when he signed the ATF Form, Prince certified that he "underst[ood] that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony." *See, e.g.*, Supp. R., Gov't Ex. 2F. Accordingly, Prince was well aware that submitting false address information was a criminal act.

Further, the evidence presented at trial gave the jury ample reason to conclude Prince knowingly lied about his address on ATF forms. First, the government established Prince never lived at the driver's license address—the address he repeatedly provided when purchasing firearms. Detectives showed Prince's photo to the neighbors there, all of whom reported that Prince did not live at the apartment complex. Further, the property manager for the apartment complex scoured her records and found that since at least 2004, no one named Judah Prince or Rex Lutes (Prince's former name) had lived in any of the apartments. Witness testimony supported this evidence.

-22-

In contrast, the evidence showed Prince resided full-time at the other residence, where the marijuana and firearms were found. Not only did Prince tell officers that this was his home address, they also discovered the deed and title for the home were in Prince's name, records showed he took out a mortgage on the home, and an employee of the power company testified that Prince had been paying the house's electric bills since January 2006. Moreover, during a search of Prince's house, an ATF agent found a mortgage document addressed to Prince at the home's address, and another ATF agent testified that the house bore indicia of active habitation, including clothing and personal items.

Prince's neighbors corroborated this evidence. For example, one neighbor testified that Prince had moved to the house approximately three years before his arrest, that she saw Prince nearly every day and had regular conversations with him, and that she observed him working in his yard. Another neighbor told the jury he regularly saw Prince mowing his lawn and clearing his driveway. And a third neighbor recounted his occasional conversations with Prince and testified that Prince moved into the house years before the search and seizure.

Thus, the jury heard ample evidence that Prince did not live at the address listed on his driver's license at any relevant time—and that he nevertheless listed that address on ATF forms when purchasing guns from federally licensed firearms dealers. We have no basis on which to overturn the jury's verdict.

## 2. *Marijuana Cultivation*

The jury also heard voluminous evidence that Prince was personally involved in growing the more than 200 marijuana plants found at his house in Newton, Kansas. To convict Prince for manufacturing at least 100 plants of marijuana, the jury had to find Prince (1) knowingly or intentionally manufactured marijuana plants, and (2) he knew the amount of the controlled substance he manufactured was at least 100 plants. Jury Instruction No. 20; *see also* 21 U.S.C. § 841(a)(1).

Prince advances several arguments that the evidence was insufficient to convict him of this charge. First, Prince argues it would have been illogical for him to store his valuable gun collection in the same place as a large marijuana growing operation, given that he knew ahead of time about the ATF investigation. Next, Prince contends it was his sons—not him—who lived in the house and grew the marijuana.[8] Prince denies living in the house at the time of the search, and he says that a latched and locked door, combined with a sophisticated ventilation system, prevented him from detecting the illicit activities in the basement. In short, Prince asserts that his adult children were solely responsible for the marijuana cultivation, and that even if he suspected illegal activity in the

---

[8] The parties stipulated that in December 2009, one of Prince's sons had been traveling in a vehicle that was transporting three pounds of marijuana.

-24-

basement, his mere suspicion does not amount to aiding and abetting under § 841(a)(1).

Whether it was logical for Prince to cultivate cannabis where he stored his guns is fundamentally a question of credibility—and therefore a question for the jury. At trial, Prince's attorney repeatedly argued that it made no sense for Prince, who knew he was under investigation, to store his firearms in a house with more than 200 marijuana plants. This was an appeal to logic unsupported by evidence. The jury apparently did not accept Prince's story, and we cannot question the jury's credibility determination unless it exceeds the bounds of rationality. It does not: none of the evidence supports Prince's contention that he sought to store his firearms in a neutral location devoid of criminal activity. Rather, he asks us to reevaluate the jury's inferences and concoct a different narrative furthering his theory of the case. This we cannot do.

Similarly, Prince's argument that he was either unaware of the marijuana grow operation, or perhaps merely suspicious of criminal activity, does not withstand scrutiny. The record shows that the marijuana plants in the Newton house basement generated a pungent stench of marijuana that wafted throughout the house. In addition to rebutting Prince's contention that the house's ventilation system masked the marijuana odor, this evidence shows that it would simply have been impossible for Prince to live at the home—which the evidence shows he did—without being aware of the illicit enterprise in his basement.

-25-

Moreover, in contrast to Prince's gloss on the evidence, the record shows that access to the basement was barely restricted at all. In fact, the basement door was not even locked, but was rather closed with a child-safety mechanism that was easily disabled. This is only the beginning of what the jury heard.

In addition, evidence of the marijuana enterprise was strewn throughout the house. In the basement, law enforcement officers found a sophisticated marijuana cultivation operation, which included a planting bed, grow lights, fertilizers, chemicals, gardening tools, drug paraphernalia, and 204 marijuana plants. Authorities also seized literature with instructions for maintaining a marijuana grow operation, composition books chronicling the progress of the plants, and writings suggesting multiple people were involved in the grow operation. Indicia of the marijuana operation were found upstairs as well, in Prince's living quarters. For example, one composition book, which contained notes about the marijuana operation, was found upstairs alongside copies of Prince's passport and driver's license—and containers of marijuana were found in an upstairs freezer.

Finally, the jury had the opportunity to match Prince's handwriting with notes in composition books found in the house. The government, without the aid of a handwriting expert, invited the jury to compare the way that the number "four" was written on Prince's ATF forms with the way it was sometimes written in the composition books found around the house. The government argued that Prince wrote the number with a distinct "pennant" shape (e.g., as it appears in

Times New Roman font—"4"), while his sons did not, and that this distinction should lead the jury to infer that Prince's handwriting appears inside the composition books. Such an inference would not have been improper.

Ultimately, there is no doubt that a reasonable jury could have found Prince guilty of manufacturing marijuana plants. Prince owned the Newton house, he lived there, and he kept personal items there. Although the marijuana grow operation was in the basement, its odor permeated the house, and it was easily accessible by anyone who could open a simple child lock. Indicators of the grow operation abounded in the house.

In sum, sufficient evidence supports the drug count.

### D. Sentencing

Finally, Prince contends the district court should not have enhanced his sentence under 21 U.S.C. § 841. Pursuant to § 841(b)(1)(B), Prince was subject to a mandatory minimum sentence of five years' imprisonment for the marijuana manufacturing offense. He also was subject to a mandatory five-year enhancement if he had a prior felony drug conviction on his record. The district court took notice of Prince's prior felony marijuana conviction and sentenced him to the mandatory minimum ten years' imprisonment.

Prince argues the district court's approach to sentencing ran afoul of the rule in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which provides that under the Sixth Amendment, the government must "submit to a jury facts which

increase a crime's penalty beyond the statutory maximum." *United States v. Holyfield*, 481 F.3d 1260, 1261 (10th Cir. 2007). More specifically, Prince claims that before he could be liable for § 841's five-year enhancement, the jury had to find that he had been convicted of a prior drug-related felony. This argument runs contrary to clear precedents in our circuit.

We have held repeatedly that despite *Apprendi*, the "fact" of a prior conviction may be found by a sentencing judge rather than a jury.[9] *See, e.g.*, *Holyfield*, 481 F.3d at 1261; *United States v. Stiger*, 413 F.3d 1185, 1191 (10th Cir. 2005). Our precedents are so clear, in fact, that Prince concedes their existence in his submissions and admittedly raises this argument only to preserve the issue for Supreme Court review. Therefore, we affirm his sentence.

## III. Conclusion

The Constitution does not prohibit the government from peremptorily striking jurors based on their views about the legalization of marijuana. Moreover, 18 U.S.C. § 924(a)(1)(A)'s record-keeping provision is not subject to

---

[9] Indeed, we have consistently enunciated a prior-conviction exception to *Apprendi*. This rule provides that when a prior conviction increases the mandatory minimum sentence, the judge, rather than the jury, may find the fact of conviction, typically by examining "the language of the statute of conviction, the terms of the charging document, the terms of the plea agreement or transcript of colloquy between judge and defendant . . ., or to some comparable judicial record of this information." *Holyfield*, 481 F.3d at 1262 (quotation omitted) (ellipsis in original).

any *mens rea* term.  For these reasons, and for all others discussed above, we

AFFIRM Prince's conviction and sentence.