**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 22, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

No. 13-5074

DEJUAN LESHAE HILL,

      Defendant - Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 4:12-CR-00050-JHP-9)**

---

Terry L. Weber, Tulsa, Oklahoma, for Defendant-Appellant.

Danny C. Williams, Sr. (Joel-lyn A. McCormick with him on the brief), United States Attorney, Tulsa, Oklahoma, for Plaintiff-Appellee.

---

Before **HARTZ**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

---

**PHILLIPS,** Circuit Judge.

Dejuan Hill[1] was indicted, tried, and convicted of both robbing Arvest Bank in Tulsa, Oklahoma in November 2011 and taking part in a larger conspiracy to rob banks, a credit union, and four pharmacies in the Tulsa area from 2009 to 2011. Before and during trial, Dejuan filed motions related to the four issues that he now raises on appeal: (1) a motion to dismiss Count One, arguing that a fatal variance existed because the Indictment against him charged a single global conspiracy but the evidence at trial instead proved multiple, smaller conspiracies; (2) a pretrial motion for misjoinder of defendants, contending that joining his charges to those of his co-defendants was improper and so prejudicial that a separate trial was required;[2] (3) a motion in limine to exclude evidence of gang affiliation, arguing that the evidence was both irrelevant to his charges and unfairly prejudicial to him; and (4) a motion for judgment of acquittal at the close of the evidence, arguing that the government produced insufficient evidence to convict Dejuan of any of his three charges. The district court denied each of these motions.

---

[1] Since Dejuan Hill allegedly committed the robbery of Arvest Bank with Vernon Hill and Stanley Hill, we will refer to him as Dejuan throughout the rest of this opinion for ease of identification.

[2] Before us, Dejuan's argument concerning misjoinder actually encompasses two related concepts: (1) that the district court erred by not granting his motion for misjoinder under Fed. R. Crim. P. 8; and (2) that the district court erred by failing to sever his trial from that of his co-defendants under Fed. R. Crim. P. 14.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. While we agree with Dejuan that there was a variance between the single conspiracy charged in the Indictment and the evidence of individual conspiracies presented at trial, we conclude that this variance was insufficiently prejudicial to affect Dejuan's substantial rights. In addition, we affirm on all other issues raised in this appeal.

## I.    Factual Background

Confronted with a series of robberies of banks and pharmacies in Tulsa, Oklahoma, Tulsa police—with the FBI's help—investigated. Law enforcement came to believe that the local Hoover Crips gang was connected to the robberies. The Tulsa Police Department has a multi-step process through which it certifies individuals as gang members and—based principally on his certification as a member of the Hoover Crips—police identified Dejuan as a person of interest in this string of robberies.

Based on their investigation, law enforcement officials eventually came to believe that several men associated with the Hoover Crips, including Dejuan, had conspired to commit a number of these robberies. A federal grand jury returned a ten-count indictment against this group of alleged co-conspirators, charging each with conspiring between August 2009 and November 2011 to commit six robberies in violation of 18 U.S.C. § 1951(a). The grand jury indicted Dejuan as a

member of this broad conspiracy and also charged him with the November 2011 robbery of Arvest Bank and—as part of that robbery—with using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

## A. *The Arvest Bank Robbery*

The Arvest Bank robbery occurred on November 5, 2011. The government argued at trial that Dejuan and Vernon Hill robbed the bank and that Stanley Hill acted as the getaway driver.[3] At around 8:30 a.m., two armed, masked men entered the bank. One carried a semiautomatic pistol and pointed it at customers while screaming profanities and ordering everyone onto the ground. Eyewitnesses said that the men were black males, based on the uncovered parts of their faces. Tellers complied with the robbers' demands to empty the cash drawers. Included in the cash that the tellers handed over to the robbers were marked bills and a GPS tracer. Police traced the GPS tracking device to Vernon Hill's home at 1107 E. Pine in Tulsa.

Tulsa Police Department Officer Donnie Johnson received a call about the bank robbery soon after 8:30 a.m. Based on the movement of the GPS tracer—but before the police determined that the GPS tracking device had stopped at 1107 E. Pine—Johnson drove his patrol car to the area by 1107 E. Pine. Police were told

---

[3] Dejuan, Vernon, and Stanley Hill are brothers.

- 4 -

to be particularly vigilant regarding that house because they had Vernon pegged as a likely bank robber and they believed he resided there.[4] Paying close attention, Johnson soon saw a man he later identified as Dejuan drive a black Nissan car[5] from a one-way alley behind 1107 E. Pine and past him. As Dejuan passed by Johnson, the two men locked eyes for a few seconds.[6]

Police detained Vernon and Stanley Hill as they separately attempted to leave 1107 E. Pine around two hours after the robbery. After obtaining a search warrant, police officers and FBI agents entered the house and seized (1) the

---

[4] Police later discovered mail addressed to Vernon at 1107 E. Pine and a cell phone registered in his name to that address, confirming their suspicions.

[5] The government presented testimony that Whitney Landrum, Stanley Hill's girlfriend and the mother of his children, owned a black Nissan similar to the one Officer Johnson saw Dejuan driving away from the alley behind 1107 E. Pine.

[6] Although not questioning Officer Johnson's identification of Dejuan as the man he saw driving the black Nissan, the dissent does question how Dejuan could have left the house at 1107 E. Pine and entered the car unseen when "law enforcement officers were present at that time establishing a perimeter around the house." [Dis. Op. at 17.] The location of the officers explains this well. Officer Johnson testified that all other law enforcement officers were positioned on E. Pine Street, in front of Vernon's house, when he arrived. Unlike them, Officer Johnson parked his police car on Norfolk, which runs perpendicular to E. Pine, and from there he was likely the sole officer able to see toward the back of the house and at the egress of the alley. During the time before he saw Dejuan driving away in the black Nissan, Officer Johnson was on foot looking for the GPS tracer in a grassy area separate from but somewhat relatively nearby to Vernon's house. Although the record is unclear whether Officer Johnson would have had a view of someone walking between the house and the Nissan, it is clear that he had an unobstructed view of the Nissan's driver as the car left the alley.

stolen money, which was $311.52 short of the $86,918.52 taken but still included the marked bills and GPS tracer, (2) one set of robber's clothes (black sweatshirt, black pants, and black ski mask), and (3) a Glock .45 caliber pistol.

The government initially prosecuted Vernon and Stanley Hill for the Arvest Bank robbery without including Dejuan. Following a court proceeding related to the prosecution of Vernon and Stanley, Officer Johnson noticed Dejuan outside the courtroom and recognized him as the person he had seen driving away in the black Nissan from the alley behind 1107 E. Pine. During a later court proceeding in that same prosecution, Officer Johnson identified Dejuan as the driver of the black Nissan. After Officer Johnson's in-court identification, Dejuan did not attend any further court proceedings in the case against Vernon and Stanley.

After evaluating all the evidence, the government expanded its charges to include Dejuan as a co-conspirator in the string of robberies and as the third robber in the Arvest Bank robbery. Before addressing the government's evidence at trial in detail, we briefly summarize it here: (1) Officer Johnson saw Dejuan driving away from 1107 E. Pine, his brother's house, minutes after the bank robbers would have arrived there; (2) Dejuan was driving a black Nissan four-door sedan, which was the same make, color, and style as a car that belonged to Whitney Landrum, his brother Stanley's girlfriend and the mother of Stanley's children; (3) cell phone records showed that three cell phones—one registered to

Vernon (Vernon's phone), the other two to Whitney Landrum—had all been located near Whitney Landrum's house on the morning of the bank robbery; (4) cell phone records showed that Vernon's phone called one of Whitney Landrum's phones (Landrum 1) from near the bank very soon before the bank robbery (the second phone registered to Whitney Landrum (Landrum 2) showed no calls after being located near Whitney Landrum's house that morning, suggesting it had been turned off); (5) cell phone records showed that Vernon's phone and Landrum 1 were near 1107 E. Pine very soon after the bank robbery; (6) cell phone records showed that Landrum 1 left 1107 E. Pine and headed south at the about the same time that Officer Johnson saw Dejuan driving away in the black Nissan; (7) during the 30 minutes after Officer Johnson and Dejuan locked eyes as Dejuan drove away from the alley behind 1107 E. Pine, Landrum 1 called Vernon's phone twice, and received one call from Vernon's phone; (8) upon searching 1107 E. Pine, officers found one set of robber's clothing but not the second set; (9) officers found at 1107 E. Pine all but $311.52 of the stolen $86,918.52; and (10) the bank's video and the eyewitness testimony showed that the second bank robber (in addition to Vernon) was of a size and complexion similar to Dejuan but not similar to Stanley.

As briefly alluded to above, the government used the cell phone records to support its position that Dejuan and Stanley Hill had used the two phones

registered to Landrum. Landrum 2, which had phone number (918) 946-1576, was active on the morning of November 5. It was located in the vicinity of 1107 E. Pine around 7 a.m. and then was located near Landrum's address—811 North Irvington—around 8 a.m. After that time Landrum 2 showed no activity until November 6, suggesting that it may have been turned off. The other two phones— Landrum 1, which had phone number (918) 313-3860, and Vernon's phone, which had phone number (918) 282-9204—were also located in the vicinity of Whitney Landrum's address at around 7:15 a.m. on November 5 and were next used while close to Arvest Bank at 8:30 a.m. Vernon's phone made a call to Landrum 1 around 8:30 a.m. in the vicinity of the bank. Around this same time, an eyewitness saw two men, whose descriptions matched those of the robbers, standing outside the bank, one speaking on a phone. After this, Landrum 1 showed no activity until around 9 a.m., when cell tower information showed it in the vicinity of 1107 E. Pine. As the cell-phone tower records showed, Landrum 1 began moving south after this and exchanged at least three calls with Vernon's phone in the next half hour. Landrum 1's movement corresponded with the period in which Officer Johnson saw Dejuan leave the area around 1107 E. Pine. The first call from Landrum 1 to Vernon's phone occurred at 9:04 a.m., which was around the same time that Officer Johnson and Dejuan made eye contact outside of 1107 E. Pine.

The government also tied Dejuan to the robbery with video from an Arvest Bank security camera and eyewitness descriptions of the robbers. Based on both the video and eyewitness observations, the Arvest Bank robbers were of similar height, with one having a light-brown complexion and the other a dark-brown complexion. Because Stanley was shorter and of a different complexion (medium-brown) than the bank robbers, the government argued that Stanley was the getaway driver.

*B. The Larger Conspiracy*

The evidence supporting Dejuan's connection to the larger conspiracy focused mostly on (1) the Tulsa Police Department's "certification" of Dejuan as a Hoover Crip and (2) Dejuan's Hoover Crip tattoo.[7] At trial, the government sought to demonstrate how all of the defendants' connections to the larger conspiracy revolved around their gang membership. Duncan Herron, a cooperating witness for the government, had been a member of the larger conspiracy but later pleaded guilty and testified for the government. As concerned Dejuan's role in the broad conspiracy, Herron testified merely that he knew Dejuan as Deandre Hopkins's brother, that he had known Dejuan for a

---

[7] Dejuan's tattoo consisted of a 27 and a set of dice. A Tulsa Police Department Officer testified at trial that the relevance of the 27 and set of dice was that "the set that he belongs to is the 27 Hoovers. He's showing his allegiance to that set."

couple years but did not consider him a close friend, and that he was unsure whether Dejuan was a Hoover Crip.

*C. Procedural History*

Of the eight alleged co-conspirators, only Dejuan, Vernon, and Deandre Hopkins ultimately proceeded to trial together. The other five pleaded guilty. There were six other robberies discussed in depth at trial—IBC Bank, Dooley's Pharmacy, Metro Pharmacy, CVS Pharmacy, Barnes Pharmacy, and Tulsa Municipal Employees Federal Credit Union—but no evidence directly linked Dejuan to any of these robberies. However, because Count One included all of these robberies except CVS as overt acts—and evidence of the CVS robbery was still included at trial because it allegedly involved Vernon, who was tried with Dejuan—Dejuan's trial included evidence regarding all six robberies.

Ultimately, the jury convicted Dejuan on the three charges against him— Count One: conspiring to obstruct, delay, and affect interstate commerce by robbery (the global conspiracy); Count Nine: obstructing, delaying, and affecting interstate commerce by robbery (Arvest Bank); and Count Ten: using, carrying, and brandishing firearms during and in relation to a crime of violence (Arvest Bank).

Dejuan raises four issues on appeal. First, he argues that there was insufficient evidence to convict him of the robbery of Arvest Bank. Second, he asserts that there was a substantially prejudicial variance between the single global conspiracy charged in the Indictment and the evidence of individual conspiracies that the government produced at trial. Third, he contends that the trial court erred either by not granting his motion for misjoinder or by failing to sever his trial from that of his co-defendants. Finally, he appeals the denial of his motion to exclude the gang evidence under Fed. R. Evid. 403.

## II. Sufficiency of the Evidence

We review de novo whether the government presented sufficient evidence to sustain a conviction. *United States v. Prince*, 647 F.3d 1257, 1268 (10th Cir. 2011). Evidence is sufficient to support a conviction if, viewing the evidence and all reasonable inferences from it in the light most favorable to the government, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* "We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury." *United States v. Summers*, 414 F.3d 1287, 1293 (10th Cir. 2005).

Having said this, however, a conviction must be grounded in more than a mere suspicion of guilt when viewing the evidence in its entirety. *Id.* at 1294. In the

criminal context, this rule derives from the government's burden to prove its case beyond a reasonable doubt. *Id.* at 1294–95. The government may use circumstantial evidence to fulfill this burden, and the "jury has wide latitude to determine factual issues and to draw reasonable inferences from circumstantial evidence." *Id.* at 1295 (quoting *United States v. McCarrick*, 294 F.3d 1286, 1293 (11th Cir. 2002)). "An inference is reasonable if it 'flows from logical and probabilistic reasoning,' i.e., with experience serving as the touchstone, a jury's inference is permissible where there is a reasonable probability that the conclusion flows from the facts in evidence." *Id.* (internal citations omitted). Or, put slightly differently, "an inference must be more than speculation . . . to be reasonable . . . . A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such [an inference] is infirm because it is not based on the evidence." *United States v. Jones,* 44 F.3d 860, 865 (10th Cir.1995) (citation and quotation marks omitted).

Here, the government relied primarily on circumstantial evidence to tie Dejuan to the robbery of Arvest Bank,[8] and we must evaluate the reasonableness of the inferences needed to move from that evidence to a conviction of Dejuan for the crimes charged. So what could the jury tell from that evidence? It could strongly

---

[8] *See supra* p. 6–7 (summarizing the evidence the government marshalled against Dejuan).

infer from Officer Johnson's testimony that Dejuan had been inside 1107 E. Pine with Vernon and Stanley because Officer Johnson saw him drive away from a one-way alley behind the house. It could also infer from the lack of the second robber's clothing at the house that one of the robbers had either left the house soon after arriving or had been dropped off somewhere on the way to the house. The cell phone records provided the information that a call was placed on Landrum 1 to Vernon's phone at about the time Officer Johnson saw Dejuan leaving Vernon's property (and that at least three calls occurred between those two phones over the next 30 minutes). The cell phone records also detailed that Landrum 1 was near 1107 E. Pine when the first call was placed but continued to move south as the calls progressed. Thus, the jury needed to take only a single inferential step to determine that this was Dejuan calling Vernon, Dejuan having just been seen by Officer Johnson.

The jury could also tell two other important things from the cell phone records introduced at trial. First, Vernon's phone placed a call to Landrum 1 right before the Arvest robbery. The government posited that this was Vernon calling Stanley, the getaway driver, before he and Dejuan entered the bank. This assertion was corroborated by an eyewitness who testified to having seen two men whose description matched that of the robbers standing outside of the bank shortly before the robbery, one of them speaking on a cell phone. And, second, the

government's cell phone evidence suggested that the three phones at issue—Vernon's phone, Landrum 1, and Landrum 2—were all located in the vicinity of Whitney Landrum's house on the morning of the robbery. Taking all reasonable inferences in the government's favor, the jury could believe from this evidence that Vernon, Dejuan, and Stanley were all in the same location shortly before the robbery of Arvest Bank. This evidence also allowed the jury to infer that, after leaving 1107 E. Pine, Dejuan called Vernon using the very phone that Vernon had called when standing outside of the bank before the robbery.

The evidence from inside the bank—the videotape and eyewitnesses—allowed the jury to determine that Stanley was not one of the robbers who entered the bank. It also allowed the jury to see—consistent with other testimony—that the second robber was about the same height and complexion as Dejuan.

How, then, could the jury move from these reasonable inferences to a supportable determination that Dejuan was the second robber? Each inference requires additional steps. First, the jury had to infer from Dejuan's presence at 1107 E. Pine not merely that he was at his brother's house, but that he arrived with Vernon and Stanley in the car after driving there with them from the Arvest Bank robbery. It also had to infer from the lack of a second robber's outfit and the missing $311.52 not merely that someone had these items, but that Dejuan was the person who had them. And, finally, it had to infer from the cell phone

records that, upon seeing Officer Johnson, Dejuan called Vernon to tell him that the police may be zeroing in.

We believe that the combination of circumstantial factors presented at trial allowed the jury to properly take these steps and determine, beyond a reasonable doubt, that Dejuan was the second robber. Understanding this conclusion requires a brief explanation of the relevant precedent regarding the use of purely circumstantial evidence. The Supreme Court long ago counseled that "[c]ircumstances altogether inconclusive, if separately considered, may, [by] their number and joint operation . . . be sufficient to constitute conclusive proof." *The Reindeer*, 69 U.S. 383, 401 (1864). Circumstantial evidence alone may permissibly support a jury's guilty verdict, *see Desert Palace Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal convictions, even though proof beyond a reasonable doubt is required."), and the government's evidence need not remove all doubt, but merely those doubts that are reasonable. *See Thornburg v. Mullin*, 422 F.3d 1113, 1130 (10th Cir. 2005) (holding that a prosecutor's "state[ment] [to the jury] that 'beyond a reasonable doubt' does not mean beyond 'a shadow of a doubt or all doubt' was not a constitutional violation" because it was not misleading).

As noted above, no single piece of the government's evidence alone conclusively establishes that Dejuan was the second robber. Taken together, however, we believe the combination of circumstances dispels any other reasonable conclusion. Any doubt that Dejuan was the second robber captured on video by the Arvest Bank security camera would require the presence of a fourth individual (other than Vernon, Stanley, or Dejuan) of the same height and complexion as Dejuan. This fourth individual would have had to do one of three things: (1) gotten out of the car on the way from the bank to 1107 E. Pine wearing the bank robbery clothing (a possibility that the GPS tracer's movements makes unlikely); (2) never entered the getaway car; or (3) managed to sneak out of 1107 E. Pine unnoticed despite the presence of numerous police officers in the vicinity. Under this scenario, Dejuan would have had to be in the unlucky position of being in the house unaware when Stanley and Vernon (his brothers and fellow gang members) returned from the bank robbery, leaving shortly thereafter when Officer Johnson identified him, and unwittingly being in possession of, and using, the very same phone that Vernon called shortly before he robbed the bank.

Although this sequence of events may be conceivable, believing that it came to pass strains credulity. We must be mindful that, again, our standard does not require that the government's evidence eliminate all doubts, but merely reasonable doubts. *See id.* Given the sequence of events that would be required

for Dejuan not to be the second robber, we hold that the government has met its burden here.

We believe that Dejuan's strongest case regarding insufficient evidence is *Summers*, so we consider it in depth. In *Summers*, two men—Omar Mohammad and Curtis Frazier—robbed a Bank of America branch in Albuquerque, New Mexico. 414 F.3d at 1292. A witness saw the robbers get into a gold Acura as it fled the bank's parking lot. *Id.* Our review of the *Summers* record shows that, as the investigation progressed, this witness—who was viewing the car from above at a diagonal and could only see the driver's side—came to believe that the car was moving when the robbers entered it, implying the existence of an additional accomplice. (Summers R., Tr. Trans. vol. 1, at 169–70.) The car was later found near the Vista Montano Apartments. *Summers*, 414 F.3d at 1292.

Before the robbery, the apartment manager of Pinnacle View Apartments (located adjacent to Vista Montano Apartments) had seen three black men, none of whom she could identify, walk onto the apartment complex grounds after parking a gold Acura outside the gate. *Id.* Her suspicions aroused, she had maintenance men watch to see where the three men went. A maintenance worker saw the three men—one carrying a black bag—enter an apartment in the complex. *Id.* The apartment was rented to Adrienne McCastle, whose boyfriend—Marvin Thomas—resided at the apartment with her (although Thomas's name was not on

the lease). *Id.* About five to ten minutes later, the maintenance worker saw four men, including Thomas, leave the apartment and drive away in a red Ford Escape SUV. *Id.* The same maintenance worker saw Thomas return alone in the same Ford Escape. *Id.* Although this worker saw Thomas then leave the apartment a second time after around five to ten minutes, no one saw him or anyone else return to the apartment. *Id.*

By this time, police had contacted the apartment manager to ask if she had seen any cars matching the getaway car used in the robbery near the apartment complex. *Id.* Given that the description of the gold Acura matched, police started watching the apartment. *Id.* Although no witness saw anyone enter the apartment after Thomas's second departure, the police later saw four black men—Thomas and Summers among them—leaving the apartment. *Id.* at 1292–93. The police followed and eventually apprehended these four. *Id.* The police found evidence in the car of the bank robbery and also found "$5,142.10 in Mr. Thomas's pockets, including ten 'bait bills'" stolen in the robbery. *Id.* at 1293. We concluded based on this record that there was insufficient evidence to convict Summers of conspiring to commit the bank robbery. *Id.* at 1292.

Equating *Summers* with Dejuan's case ignores many extenuating circumstances present in *Summers* but absent here. In *Summers*, the government's claim that a third person besides Mohammad and Frazier participated in the

- 18 -

robbery relied mainly on one eyewitness who claimed that the gold Acura the robbers escaped in was already moving when the two robbers got into opposite sides of the car. *Id.* at 1296. In his initial statement to police, the witness had not mentioned that the car was moving when the two robbers reached it, explaining at trial that he later realized that was what he had seen. (Summers R., Tr. Trans. vol. 1, at 169–70.) He did not see a third person in the car and testified that one of the robbers had quickly entered the *driver's* side of the *moving*, *two-door* car. (*Id.* at 161, 169.) In fact, his revised recollection (that perhaps there had been a third person) was based principally on a contention that the car "left very fast" for two people to have entered it, started it, and then departed. (*See id.* at 161.) For Summers to be the getaway driver—the government's theory against him at trial—the bank robber entering the driver's side door of the moving car would have had to smoothly climb over Summers to the backseat as the car sped from the bank, all without a hitch. Such unlikely acrobatic skills hardly squared with proof beyond a reasonable doubt. One would assume that a witness intently watching the driver's side of the car would have seen something other than a smooth getaway if one of the bank robbers tried to enter the rear seat of the *two-door* car while a third person was already seated in front, driving. (Summers R., Ex. 46.) Even the presence of a third person, then, was a troublesome question in *Summers*.

By contrast, in Dejuan's case the government's theory supporting three bank robbery co-conspirators (Vernon, Stanley, and another man) relied on many pieces of evidence. These included: (1) the videotape of the robbers (specifically the robbers' heights and complexions); (2) the lack of a second robber's outfit at 1107 E. Pine; (3) the $311.52 missing from the money discovered at 1107 E. Pine; (4) the speed at which the GPS tracer traveled from the vicinity of the bank to 1107 E. Pine; and (5) the cell phone communications between Vernon's phone and Landrum 1.

Moreover, here any theory involving an unknown fourth man (beyond Vernon, Dejuan, and Stanley) participating in the robbery requires many inferential leaps, leaps unnecessary in *Summers*. Simply put, *Summers* was a much weaker case than Dejuan's. Even if one accepts the almost preposterous view that two bank robbers jumped into a moving, two-door car, nothing introduced at trial indicated that the third person driving the car was Summers. Why couldn't Thomas have been one of the three men? Couldn't one of the times he left the apartment have been to participate in the robbery? It seems at least as reasonable as the government's alternative scenario. A central problem in *Summers*, then, was that the government's theory involved a three-person crime but the government offered the jury four possibly culpable parties (Mohammad, Dwayne, Thomas, and Summers), two of whom (Summers and Thomas) were equally likely to have

been the third robber. Finding reasonable doubt in Dejuan's case, by contrast, would require the jury to concoct a highly implausible scenario in which another robber besides Vernon, Stanley, and Dejuan was present at the robbery. Again, this robber would have had to have done one of the following: (1) been dropped off before the robbers returned to 1107 E. Pine (despite the speed with which they returned); (2) quickly taken $311.52 from the $86,918.52 of loot outside the bank, entered a separate car, and sped away; or (3) returned with Vernon and Stanley to 1107 E. Pine, left the house, and evaded the many police officers who were in the area.

And these two distinctions say nothing of the timing issues present in *Summers* that are not at issue in the case before us. Here, Officer Johnson saw Dejuan leaving a one-way alley behind his brother's house at 1107 E. Pine minutes after the robbers would have arrived at the house. In *Summers*, however, there were multiple times when unidentified individuals entered and left the apartment. *Summers*, 414 F.3d at 1292. To find that Summers was either one of the robbers or had participated in the robbery as a conspirator, the jury essentially was asked to take it on faith that because Summers was in the last group that left the apartment, he must have been in the earlier one that first entered the apartment. *Id.* at 1296. The case before us does not present the same difficulties.

The numerous factual deficiencies in the government's case in *Summers* supported the court's conclusion that the government had presented insufficient evidence to sustain Summers's conviction. But the evidence against Dejuan is much stronger. We perceive no difficulty squaring our finding here with our precedent in *Summers*.

In sum, we conclude that sufficient evidence existed for the jury to convict Dejuan beyond a reasonable doubt.

### III.    Variance in the Conspiracy Charge

Dejuan argues that—contrary to Count One of the Indictment, which charged him with participating in a global conspiracy to rob banks, a credit union, and pharmacies—the government's evidence at most showed that Dejuan was a participant in a separate, smaller conspiracy to rob Arvest Bank.[9] Due to this discrepancy, Dejuan contends that the government failed to prove interdependence as to the global conspiracy, and thus there was a variance between the Indictment and the conviction. This variance substantially prejudiced him, he argues, because it "transferr[ed] guilt to Dejuan . . . for crimes that he had no involvement in and created a spillover effect."

---

[9] As we noted and rejected above, Dejuan argues that the government's evidence was insufficient even to convict him for the robbery of, and conspiracy to rob, Arvest Bank.

We review this question de novo. *United States v. Williamson*, 53 F.3d 1500, 1512 (10th Cir. 1995). "We treat a conspiracy variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008) (quoting *United States v. Griffin*, 493 F.3d 856, 862 (7th Cir. 2007)) (internal quotation marks omitted). To prove a conspiracy, the government must establish: (1) that an agreement existed between two or more people to violate the law; (2) that the defendant knew at least the conspiracy's essential objectives; (3) that the defendant knowingly and voluntarily became a part of the conspiracy; and (4) that the co-conspirators were interdependent. *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007). Interdependence requires that each co-conspirator must have a shared criminal objective, not just similar or parallel objectives between similarly situated people. *United States v. Evans*, 970 F.2d 663, 670–71 (10th Cir. 1992). We must evaluate "what kind of agreement or understanding existed as to each defendant." *United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989) (quoting *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964)).

Even if we determine that a variance occurred, we need not reverse the district court unless we determine that the defendant was substantially prejudiced by the variance. *United States v. Edwards*, 69 F.3d 419, 433 (10th Cir. 1995). A variance

can be prejudicial by either failing to put the defendant on sufficient notice of the charges against him, *United States v. Windrix*, 405 F.3d 1146, 1154 (10th Cir. 2005), or by causing the jury to determine the defendant's guilt by relying on evidence presented against other defendants who were involved in separate conspiracies (the so-called "spillover effect"), *Edwards*, 69 F.3d at 433. When deciding whether a prejudicial spillover occurred, we consider (1) whether the separate conspiracies affected the jury's ability to evaluate each defendant's individual actions, (2) whether the variance caused the jury to misuse evidence, and (3) the strength of the evidence underlying the conviction. *Carnagie*, 533 F.3d at 1241.

A. Variance

We agree with Dejuan that there was a variance here between the conspiracy charged in the Indictment and the crimes proved at trial. We analyze this question by considering whether there was sufficient evidence to tie Dejuan to the larger global conspiracy alleged in Count One. *See id.* at 1237. While we believe that there was sufficient evidence to convict Dejuan of the robbery of Arvest Bank—and of the conspiracy to rob Arvest Bank—there was scant evidence tying Dejuan to any larger conspiracy. Our review of the record suggests that the evidence of Dejuan's participation in the larger conspiracy consisted merely of the Tulsa

Police Department's certification that Dejuan was a Hoover Crip and of Dejuan's gang tattoo.

In fact, Duncan Herron—the government's cooperating witness, whose testimony the government highlighted for us when contesting Dejuan's assertion that a variance existed—barely testified at all regarding Dejuan's role in any larger conspiracy. Herron testified simply that he knew Dejuan and that he was unsure whether Dejuan was a Hoover Crip. While we have previously held that "gang-affiliation testimony may be relevant" where conspiracy is charged, *United States v. Archuleta*, 737 F.3d 1287, 1293 (10th Cir. 2013), gang membership alone cannot sustain a conspiracy conviction, *United States v. Robinson*, 978 F.2d 1554, 1563 (10th Cir. 1992). Given that the government's evidence proved nothing more than Dejuan's gang affiliation, there was insufficient evidence tying Dejuan to the larger conspiracy and a variance existed. *See Carnagie*, 533 F.3d at 1237.

B. Prejudice

Even having determined that a variance existed, we still must decide whether the variance prejudiced Dejuan. One way it might prejudice Dejuan would be by failing to sufficiently notify him of the charges. *United States v. Caldwell*, 589 F.3d 1323, 1333 (10th Cir. 2009). We have previously noted that "[w]hen an

indictment charges a conspiracy among multiple individuals, it generally provides sufficient notice to a defendant that she must defend against the smaller conspiracies." *Id*. Here, Count One of the Indictment recited every robbery the government was relying on to support its case. This provided Dejuan adequate notice of both the charges he must defend against and what evidence would be offered against him. *See Carnagie*, 533 F.3d at 1241.

Another way the variance could have prejudiced Dejuan is by an evidentiary spillover. Dejuan points us to no specific instances of evidentiary spillover that prejudiced him, instead arguing broadly that "[t]he government's evidence of multiple conspiracies created what is not allowed by the teaching of [*Kotteakos v. United States*, 328 U.S. 750 (1946)], it resulted in transferring guilt to [him] for crimes that he had no involvement in and created a spillover effect." We therefore pivot to examine Dejuan's case through the three factors detailed in *Carnagie* in order to determine whether a prejudicial spillover occurred. 533 F.3d at 1241.

### i. *Did the separate conspiracies affect the jury's ability to evaluate each defendant's individual actions?*

Addressing the first consideration, the Supreme Court counseled us in *Kotteakos* that the greater the number of conspiracies proved and defendants tried, the higher the probability of prejudice. 328 U.S. at 772 ("Numbers are vitally important in trial, especially in criminal matters."). In *Kotteakos*, thirty-

two individuals were indicted, nineteen were tried together, and at least eight separate conspiracies were proved. *Id.* at 752–53, 758. The Court emphasized that no absolute rule exists for determining prejudice based on the number of defendants tried and conspiracies proved; instead, a reviewing court must look to the individual facts of each case to determine whether a defendant has suffered substantial prejudice. *See id.* at 773–74. We have previously held that trying three defendants together, where evidence of three separate conspiracies is introduced, does not give rise to a risk of prejudice sufficient enough to warrant reversal. *See Carnagie*, 533 F.3d at 1242.

Here, we are confronted with a case where three defendants were tried together and jointly charged, along with five others, under the global conspiracy count. Due to this, we must acknowledge that the jury heard evidence at trial regarding six robberies other than Arvest Bank—none of which were alleged to directly implicate Dejuan. However, even if we were to broadly conclude that each individual robbery involved its own small conspiracy (meaning five separate conspiracies),[10] we would also conclude that this ratio did not risk prejudicing

[10] To briefly summarize, these conspiracies would involve the robberies of: (1) Dooley's Pharmacy; (2) Barnes Pharmacy (uncharged but identified in the overt acts furthering the global conspiracy); (3) Metro Pharmacy; (4) Tulsa Credit Union; and (5) Arvest Bank. While there were two other robberies discussed at trial—IBC Bank and CVS Pharmacy—the government did not provide evidence of a conspiracy for either robbery. The IBC Bank robbery, which was identified

Dejuan sufficiently to warrant reversal of his conviction under Count One. *Cf. id.* (thirty-four individuals indicted, three defendants tried together, and evidence of three conspiracies introduced does not lead to a risk of prejudice sufficient enough to warrant reversal).

The dissent disputes this contention. It argues that because (1) Dejuan's case involved more small conspiracies than *Carnagie* and (2) these conspiracies involved shifting groups of people, the numerosity present here may well have rendered the jury unable to compartmentalize the evidence against Dejuan. [Dis. Op. at 3–4.] This discussion omits the fact that—whatever the numbers present—Dejuan was only alleged to be involved in one discrete event. In such a circumstance, we believe that the jury would have no difficulty compartmentalizing evidence bearing on his guilt. Additionally, we note that the dissent fails to recognize that thirty-four people were indicted in *Carnagie*, as compared to eight here. 533 F.3d at 1242. Likewise, thirty-two people were indicted for the global conspiracy in *Kotteakos*, nineteen of whom were tried

---

as an overt act furthering the global conspiracy and charged in Count Two, involved Vernon alone and thus could not constitute a conspiracy. The government did not charge CVS Pharmacy or identify it as an overt act furthering the global conspiracy, instead only mentioning this robbery in an attempt to prove Vernon's guilt for the other robberies. We discuss both of these robberies in more depth in Vernon's separate appeal. *United States v. [Vernon] Hill*, __ F. App'x __, No. 13-5084 (10th Cir. __, 2015) (unpublished).

together. 328 U.S. at 752–53. Given these ratios, the numerosity present here (five conspiracies, three defendants, eight indicted) is at most as prejudicial as that present in *Carnagie* (three conspiracies, three defendants, thirty-four indicted) and is less prejudicial than that present in *Kotteakos* (eight conspiracies, nineteen defendants, thirty-two indicted). Our Circuit has still not found a case post-*Kotteakos* with a ratio high enough to rise to the level of prejudice. Dejuan's situation is not nearly severe enough to breach that boundary.

### ii.    Did the variance cause the jury to misuse evidence?

The second *Carnagie* factor asks whether the variance caused the jury to misuse evidence. Here, we consider (1) whether the evidence was so complex that it rendered the jury unable to compartmentalize Dejuan's individual actions, (2) whether the transactions allegedly part of the broader conspiracy were "of the . . . same character" as the robbery of Arvest Bank, and (3) whether the jury actually demonstrated that it could compartmentalize the evidence by convicting Dejuan of only the underlying counts where there was evidence establishing that he directly participated. *Carnagie*, 533 F.3d at 1242–43.

None of these considerations favors Dejuan. First, the evidence here was not sufficiently intricate that the jury could not segregate Dejuan's individual actions. The evidence consisted of, among other things, eyewitness accounts, physical

evidence, and security camera footage, rather than—for example—complex testimony from a host of expert witnesses. Second, the entire charged conspiracy consisted of a string of similar robberies that the government claimed were related. The evidence presented against Dejuan thus related to transactions of the "same character" as the robbery of Arvest Bank. And, finally, Dejuan was charged and convicted of only the Arvest Bank robbery. Since Dejuan was not charged with any of the other robberies, the jury had no opportunity to show its ability to compartmentalize the evidence against him. This makes the third factor at best neutral for Dejuan. For these reasons, the second *Carnegie* consideration also does not render the variance prejudicial against Dejuan.

### iii. Was there sufficiently strong evidence underlying the jury's decision?

This leaves the third *Carnagie* factor, which considers the strength of the evidence underlying the conviction for conspiracy. This factor considers whether the prosecution presented enough evidence to convict Dejuan of the separate, smaller conspiracy of the robbery of Arvest Bank. *Id.* at 1243. In Dejuan's case, undertaking this analysis seems at first both repetitive and problematic. Indeed, before going through any analysis, we believe we must first answer two key questions: (1) having already determined that there was sufficient evidence to convict Dejuan of the Arvest Bank robbery, must we analyze this evidence again

in considering the third *Carnagie* prong? and (2) if we must undertake this analysis again, do different standards undergird our review?

In the case before us, the answer to the first question must be yes. Here, the sole smaller conspiracy in which Dejuan allegedly participated was the robbery of Arvest Bank. While we have found that evidence sufficient to convict Dejuan of the robbery of Arvest Bank, the inquiry here is whether that evidence was sufficient to convict Dejuan of conspiring to rob Arvest Bank. This is a separate question that may yield a different answer. *See United States v. Felix*, 503 U.S. 378, 391 (1992) (noting "the established doctrine that a conspiracy to commit a crime is a separate offense from the crime itself").

Regarding the second question, we believe that, while the considerations that go into our review of the evidence at this stage are slightly different, both of our reviews of the evidence in this case reach the same result and require a similar standard of review. We believe that analyzing the "strength" of the evidence under the third *Carnagie* factor requires us to take two steps: (1) we must strip away all the evidence of a larger conspiracy (here, the evidence of the other bank, credit union, and pharmacy robberies) and ask if, excluding this evidence, there was still enough evidence to convict Dejuan of conspiring to rob Arvest Bank, *see Carnagie*, 533 F.3d 1243–44 (evaluating how much evidence the jury heard to convict the defendant of the smaller conspiracy); and (2) we must consider

whether the evidence of the conspiracy in which Dejuan was implicated was so much weaker than the evidence introduced regarding the larger conspiracy that a substantial, prejudicial spillover must have resulted, *see United States v. Harrison*, 942 F.2d 751, 758–59 (10th Cir. 1991) (comparing the evidence adduced against the defendant with that offered against his co-defendants).

Since, again, the conspiracy evidence in this particular case is coterminous with the Arvest Bank robbery evidence, we are essentially reevaluating the same evidence but considering it through the lens of a conspiracy charge. But what standard must the evidence meet? While our precedent speaks of the "strength" of the evidence when considering the third *Carnagie* factor, *see, e.g.*, *id.* at 758 (quoting *United States v. Morris*, 623 F.2d 145, 149 (10th Cir. 1980)), this does not mean that the evidence must meet some standard higher than sufficiency. Indeed, in the case before us, it would seem somewhat incongruous to conclude that there was sufficient evidence for the jury to convict Dejuan of the robbery of Arvest Bank, but that this evidence—while also sufficient to convict Dejuan of conspiring to rob the bank—was somehow not "strong" enough to sustain the conspiracy conviction. This is particularly true given that we must view the evidence from the perspective that tends to support the jury's verdict. *Id.* at 754. Thus, the first step when analyzing the "strength" of the evidence under the third *Carnagie* factor considers merely the sufficiency of the evidence involving the

smaller conspiracy. The second step seeks to place this evidence within the context of all of the evidence introduced at the actual trial.

Here, we conclude that the evidence was sufficient to convict Dejuan of conspiring to rob Arvest Bank. We also believe that this evidence was not so much weaker than the other evidence introduced at trial that it led to a substantial danger of prejudicial spillover. As noted above, the government must show four things to prove a conspiracy: (1) that a defendant and at least one other person agreed to violate the law; (2) that the defendant knew at least the essential objectives of the conspiracy; (3) that the defendant knowingly and voluntarily became a part of the conspiracy; and (4) that the alleged co-conspirators were interdependent. *Sells*, 477 F.3d at 1235. When we take the evidence from the perspective tending to support the jury's verdict, *Harrison*, 942 F.2d at 754, it shows that Dejuan met with Vernon and Stanley at Whitney Landrum's house before the robbery, that he participated as an active member in the robbery's execution, and that the robbery required that different tasks be fulfilled by all of the robbers to enable its execution. The cell phone evidence in particular shows the elements of planning and coordination necessary to support a conviction for conspiracy. Taken together, this evidence was sufficient to convict Dejuan of conspiring to rob Arvest Bank.

At the second step, we conclude that the evidence proving Dejuan's role in the smaller conspiracy was strong enough to minimize the danger of prejudicial spillover. We do not come to this conclusion lightly and caution the government that this case treads the line where the potential for spillover may become too great. We express this caution principally because, while there were many pieces of direct evidence tying other co-conspirators to other crimes, much of the evidence implicating Dejuan in the Arvest Bank robbery was circumstantial. However, despite this difference, we ultimately conclude that the evidence implicating Dejuan in the conspiracy to rob Arvest Bank was strong enough to affirm the jury's verdict.

The dissent concludes that prejudicial spillover led the jury to convict Dejuan of the Arvest Bank charges. In support, it contends that the evidence adduced against Dejuan's co-conspirators was "*more likely than not* imputed to [Dejuan] by the jury in its determination of [Dejuan's] guilt." [Dis. Op. at 13 (quoting *Carnagie*, 533 F.3d at 1241) (emphasis added in dissent) (internal quotation mark omitted).] But the dissent also agrees that the evidence was sufficient to convict Dejuan of robbing, and conspiring to rob, Arvest Bank. [Dis. Op. at 1, 12–13.] From these two positions, we understand the dissent to say that spillover prejudice resulted from Dejuan's increased likelihood of conviction. In view of

the evidence described supporting Dejuan's convictions, we disagree with the dissent that this would provide sufficient prejudice to merit a new trial.

Moreover, we note that Dejuan did not object to the introduction of much of the evidence introduced to support the global conspiracy. Unlike the dissent, we see possible benefits (and not just possible prejudice) to Dejuan from this global-conspiracy evidence. This evidence gave Dejuan a favorable avenue to try to undermine the (sufficient) evidence of his guilt in the Arvest Bank robbery. His closing argument shows how the evidence could benefit his case:

> There were about 60 witnesses that testified in this case. The word "Dejuan Hill" was almost never mentioned. It was never mentioned for a reason; because he's not involved. He was not in any way related to the IBC Bank robbery of 2009, the Metro Pharmacy robbery, Dooley Pharmacy robbery, T. Roy Barnes robbery, CVS robbery, credit union robbery, and in no way related to the Arvest Bank robbery, none. Those are the facts. Not even the infamous Duncan Herron mentioned my client's name. Even he couldn't come up with a reason to talk about him.

Faced with this argument, a reasonable jury might wonder whether Dejuan was really involved in the Arvest Bank robbery considering the dearth of evidence that he was involved in the other criminal activity. We conclude that the jury convicted based on the strength of evidence proving his involvement in the Arvest Bank robbery, not on evidence of his involvement (really, *non-involvement*) with other men committing other crimes.

We thus conclude that Dejuan's claim of a prejudicial variance affords him no relief. While there was a variance between the larger conspiracy alleged in the Indictment and the smaller conspiracy proved at trial, we conclude that this variance was not prejudicial. We therefore affirm the district court.

## IV. Misjoinder

As noted above, Dejuan contends that the district court erred either by not granting his motion for misjoinder under Fed. R. Crim. P. 8 or by failing to sever his trial from that of his co-defendants under Fed. R. Crim. P. 14. Dejuan's argument regarding Rule 8 is principally based on his belief that his case did not satisfy the requirements of Rule 8(b), which pertains to the joinder of defendants:

> Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b). Dejuan contends that his alleged participation in only one robbery "does not meet Rule 8(b)'s requirement that defendants participated in the same act or transaction or in the *same series of acts or transactions constituting an offense*." He argues that the Indictment failed to aver facts demonstrating the existence of an overall scheme or agreement involving all of the defendants and all of the charged offenses. This, he says, was because the

- 36 -

Indictment merely suggested that all the defendants were members of a street gang, but it did not allege that the street gang was itself involved in the series of acts or transactions.[11]

Addressing Rule 14, Dejuan contends that the court should have severed his trial to avoid potential prejudice arising from trying him together with his co-defendants Vernon and Hopkins. Dejuan's argument principally involves Rule 14(a), which concerns a court's right to grant relief from prejudicial joinder:

> Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). Dejuan argues that he was prejudiced because the jury heard evidence about robberies implicating his co-defendants, but not him. This, he says, led to the possibility of "[g]uilt by association" and should have warranted severance.

While we review alleged misjoinder under Rule 8 de novo, *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997), we "construe Rule 8 broadly to allow liberal joinder to enhance the efficiency of the judicial system." *United States v. Jones*, 530 F.3d 1292, 1298 (10th Cir. 2008) (quoting *Johnson*, 130 F.3d

---

[11] Belying Dejuan's contention is the Indictment's first Manner and Means of the Conspiracy: "It was part of the conspiracy that the conspirators were and are members or affiliates with the Hoover Crips street gang."

at 1427). Under Rule 14, the decision to grant a severance generally lies "within the sound discretion of the trial court and its decision will not ordinarily be reversed in the absence of a strong showing of prejudice." *United States v. Valentine*, 706 F.2d 282, 289 (10th Cir. 1983) (quoting *United States v. Strand*, 617 F.2d 571, 575 (10th Cir. 1980)). We review claims of misjoinder under Rule 14 under an abuse of discretion standard, and here the defendant bears a particularly heavy burden when seeking to demonstrate an abuse of discretion. *United States v. Jones*, 213 F.3d 1253, 1260 (10th Cir. 2000).

Considering Rule 8 first, we find Dejuan's arguments unavailing. Although the Indictment in this case charged six different robberies alleged to have been committed by different defendants over a more than two-year period, it also alleged that the defendants conspired and agreed with each other to commit all six of the robberies. Given the broad construction we afford Rule 8 and our preference for liberal joinder, this was sufficient to permit joinder.

We also cannot grant Dejuan relief under Rule 14. While Dejuan broadly alleges prejudice, he does not point this court to any specific instances in his trial where prejudice occurred. This broad contention is insufficient under Rule 14. *See United States v. Pursley*, 474 F.3d 757, 766 (10th Cir. 2007) ("To establish prejudice, a defendant must point to a 'specific trial right' that was compromised or show the jury was 'prevent[ed] ... from making a reliable judgment about guilt

or innocence.'" (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993))). Dejuan's claim seems, at best, to be that his chances of acquittal may have been better in a separate trial. This type of assertion is insufficient to demonstrate prejudice under Rule 14. *Id.* at 766.

Further, we note that—even were Dejuan able to demonstrate prejudice—this alone would still not require severance under Rule 14. *Zafiro*, 506 U.S. at 538–39. Rather, in that case, Rule 14 would leave the tailoring of any relief to the trial court's discretion. *Id.* One such method of relief would be to offer a limiting instruction to the jury that it should individually consider the charges against each defendant. *Id.* at 539 ("When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."). The district court offered such an instruction here, buttressing our conclusion that Dejuan suffered no prejudice from joinder to his co-defendants.

We therefore cannot grant Dejuan relief on either his claim under Rule 8 or his claim under Rule 14. We affirm the district court on both of these issues.

V.     Gang Affiliation Evidence

Dejuan's final argument is that the trial court erroneously denied his motion in limine to exclude the evidence regarding his gang affiliation. Dejuan argues that

the government introduced no evidence suggesting that his gang membership was relevant to the issues presented at trial, including no evidence that gang membership was important to the formation, agreement, or purpose of the conspiracy. In addition, he contends the gang affiliation evidence was unfairly prejudicial.

We review a district court's evidentiary determinations for an abuse of discretion. *United States v. MacKay*, 715 F.3d 807, 839 (10th Cir. 2013). Under Fed. R. Evid. 403, a trial court may exclude otherwise "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." We "afford[] the district court considerable discretion in performing the Rule 403 balancing test because district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues." *Archuleta*, 737 F.3d at 1292. Addressing the introduction of gang affiliation evidence when conspiracy is charged, we have previously affirmed numerous district court decisions concluding such evidence to be both relevant and probative. *See id.* at 1293–94 (citing numerous cases where this court has permitted the introduction of gang-related evidence to demonstrate conspiracy).

Dejuan's arguments provide us with no reason to vary from these cases. Before we delve into the bases for this conclusion, however, we must acknowledge two points that support Dejuan's contention here. First, it is true

that the evidence presented at trial only established smaller conspiracies, rather than the larger, global conspiracy alleged in the Indictment. And, second, it appears based on our review of the record that the only evidence presented by the government at trial tying Dejuan to the larger conspiracy was evidence of his gang affiliation.

Having acknowledged these issues, how do we still reach the conclusion that the introduction of this evidence was not an abuse of discretion? Simply stated, both of the points we noted in favor of Dejuan are subject to hindsight bias. At the time of the district court's decision regarding Dejuan's motion in limine, the alleged co-conspirators had been indicted as members of the same global conspiracy. As noted above, this made the probative value of the evidence regarding Dejuan's alleged gang affiliation considerable. *See id.*

We believe that the danger of unfair prejudice was limited when we consider the other evidence linking Dejuan to the robbery of and conspiracy to rob Arvest Bank. The jury was not left to rely solely on Dejuan's gang affiliation to determine that he was a member of a conspiracy to rob Arvest Bank and that he had participated in the Arvest Bank robbery. Rather, the jury was able to consider cell phone records, an eyewitness who placed Dejuan near the place where the stolen money was later found, and the similarities in physical appearance between Dejuan and one of the robbers. We believe that—at the time of the district court's

ruling—the probative value of the evidence of Dejuan's gang affiliation was not substantially outweighed by the danger of unfair prejudice. While the evidence may have prejudiced Dejuan, it was not *unfairly* prejudicial such that it ran afoul of Rule 403. The district court's determination was not an abuse of discretion.

## VI.    Conclusion

While Dejuan is correct that a variance existed between the larger conspiracy charged in the Indictment and the smaller conspiracies proved at trial, this variance did not prejudice Dejuan in a manner warranting reversal. We therefore conclude that no prejudicial variance existed and affirm the district court. We also affirm the district court as to all other issues raised in this appeal.

No. 13-5074, *United States v. Dejuan Hill*

**McHUGH**, Circuit Judge, dissenting in part and concurring in part:

I join in the majority's well-reasoned conclusion that the government failed to prove a global conspiracy, thereby creating a variance between Dejuan's indictment and what the government ultimately proved. But I respectfully disagree with the majority's holding that the variance did not substantially prejudice Dejuan's right to a fair trial. In my view, by prosecuting a single global conspiracy, the government subjected Dejuan to largely irrelevant and prejudicial evidence that the jury more likely than not unfairly imputed to him. And although I agree that the relevant evidence, presented in a fair trial and when viewed in the light most favorable to the government, would be sufficient to convict Dejuan of robbing the Arvest Bank, I do not agree that this evidence was strong enough to outweigh a substantial risk of prejudicial spillover. Thus, I respectfully dissent from the decision affirming Dejuan's convictions. I would instead reverse and remand for a new trial.

Where, as here, the government has charged a defendant with participation in a larger conspiracy but the evidence instead establishes several smaller conspiracies, the defendant is entitled to reversal if the variance prejudices his substantial rights. In turn, a variance prejudices a defendant's substantial rights "if the evidence adduced against co-conspirators involved in separate conspiracies was more likely than not imputed to the defendant by the jury in its determination of the defendant's guilt." *United States v. Carnagie*, 533 F.3d 1231, 1241 (10th Cir. 2008); *see Kotteakos v. United States*, 328 U.S.

750, 775 (1946) (the substantial right we must protect is "the right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others").

Because "[t]he tactic of charging many defendants with a single massive conspiracy is fraught with the potential for abuse[,] . . . we must be particularly vigilant when the government seeks to bring many individuals under the umbrella of a single conspiracy." *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992). "The risk is that a jury will be so overwhelmed with evidence of wrongdoing by other alleged coconspirators that it will fail to differentiate among particular defendants." *Id.* Accordingly, we must carefully examine the trial record as a whole, guided but not limited by consideration of three factors. *See Kotteakos*, 328 U.S. at 762 (requiring that we engage in a flexible inquiry, considering the proceedings in their entirety, "tempered but not governed in any rigid sense of stare decisis by what has been done in similar situations"). First, we consider "whether the proliferation of separate crimes or conspiracies presented in the case impaired the jury's ability to segregate each individual conspirator's actions and the evidence associated with . . . his participation." *Carnagie*, 533 F.3d at 1241 (brackets omitted). Second, we must assess "whether confusion among members of the jury concerning the legal limitations on the use of certain evidence resulted from the variance." *Id.* And third, we are charged with evaluating "the strength or weakness of the evidence underlying the jury's conviction." *Id.* Considering the record in this case, I would conclude the variance substantially prejudiced Dejuan's right to a fair trial.

I begin, as the majority does, by considering the number of individuals indicted, defendants tried, and conspiracies established at trial. The greater the number of defendants and conspiracies established at trial, the more likely it is that the jury will be unable to segregate each individual coconspirator's actions. *United States v. Morris*, 623 F.2d 145, 150 (10th Cir. 1980) ("[t]he possibility of prejudice resulting from a variance increases with the number of defendants tried and the number of conspiracies proven."). *Compare Kotteakos*, 328 U.S. at 753, 758, 774 (concluding that a variance was prejudicial where thirty-two persons were indicted for conspiracy, nineteen defendants were tried together, thirteen names were submitted to the jury, and at least eight separate conspiracies were proven), *and United States v. Butler*, 494 F.2d 1246, 1251 (10th Cir. 1974) (finding a prejudicial variance where twenty-three defendants were indicted and at least three conspiracies were established), *with Berger v. United States*, 295 U.S. 72, 80, 83–84 (1985) (holding there was no prejudice when four defendants were tried for a single conspiracy and two separate conspiracies were proven), *and Carnagie*, 533 F.3d at 1242 (holding the risk of prejudice was minimal where three defendants were tried and at most, three conspiracies were established).

The majority, citing *Carnagie*, concludes that because the government charged only eight individuals and tried only three defendants (Vernon, Dejuan, and Deandre Hopkins) in this case, the jury was able to compartmentalize the evidence against Dejuan from that of his alleged global coconspirators. I disagree. Although only three defendants ultimately

went to trial, the government introduced evidence regarding seven robberies and six related conspiracies.[1] Thus, in terms of the smaller conspiracies established at trial, this case falls somewhere between *Berger* (two conspiracies) and *Kotteakos* (eight conspiracies). And the number of smaller conspiracies here is greater than in *Carnagie*, where there was evidence of, at most, three smaller conspiracies. In addition, although Dejuan was only alleged to have been involved in the Arvest Bank robbery, the risk the jury would be unable to compartmentalize the evidence against Dejuan and the other alleged coconspirators, despite Dejuan's discrete involvement, was amplified by the fact that all of the smaller conspiracies to rob banks and pharmacies were alleged to involve shifting combinations from the same group of African-American men alleged to be Hoover Crips gang members or affiliates. This made it difficult to differentiate among the

---

[1] The record makes clear that there was evidence of six smaller conspiracies, not five as the majority suggests. As the majority notes, the government established evidence of seven robberies, including the (1) IBC Bank; (2) Dooley Pharmacy; (3) Barnes Pharmacy; (4) Metro Pharmacy; (5) Tulsa Credit Union; (6) Arvest Bank; and (7) CVS Pharmacy (neither charged nor identified as an overt act furthering the global conspiracy but offered as prior acts evidence). However, all of these robberies—with the exception of the IBC Bank—involved multiple parties. Unlike the majority, I include the CVS Pharmacy as an established conspiracy because the government presented evidence that showed three people robbed the CVS Pharmacy. But even if I were to exclude the CVS Pharmacy as a smaller conspiracy, it would not change my conclusion that the government's presentation of the case, taken as a whole, prejudiced Dejuan. *See Kotteakos v. United States*, 328 U.S. 750, 762 (1946) (requiring that we consider the proceedings in their entirety, "tempered but not governed in any rigid sense of stare decisis by what has been done in similar situations").

particular participants in each robbery.[2] *See United States v. Gallegos*, ___ F.3d ___, No. 13-6236, 2015 WL 1935223, at *5 (10th Cir. Apr. 30, 2015) (holding that in ascertaining whether there was a prejudicial variance, we consider "the complexity of the evidence and the jury's ability to distinguish the evidence against one defendant from the evidence against his or her co-defendants"); *United States v. Coward*, 630 F.2d 229, 230–31 (4th Cir. 1980) (finding a variance prejudicial where it was impossible for the jury to consider the appropriate evidence against each defendant because of the subtleties of the evidence and its emanation from common sources). Accordingly, I believe consideration of the number of indicted individuals and conspiracies established at trial made it likely the jury would be unable to segregate each individual coconspirator's actions.

In any event, although numbers are "vitally important" in examining the risk of prejudicial spillover, other factors illustrate Dejuan was prejudiced by the variance. *Carnagie* instructs that we should also consider whether the jury was confused concerning the legal limitations on the use of certain evidence that resulted from the variance. 533 F.3d at 1241. Perhaps the most compelling indication of the jury's confusion is its decision to convict Dejuan and his two codefendants for conspiring to rob

---

[2] Specifically, the government alleged that Marquis Devers and Kenneth Hopkins robbed the Dooley Pharmacy; Deandre Hopkins and two unknown others robbed the Barnes Pharmacy; Vernon, Mr. Devers, Deandre, Chris Lewis, Dontayne Tiger, and Duncan Herron robbed the Metro Pharmacy; Vernon, Mr. Devers, and Mr. Lewis robbed the CVS Pharmacy; Mr. Lewis, Deandre, Mr. Devers, Mr. Tiger, James Miller, and Duncan Herron robbed the Tulsa Credit Union; and Vernon, Dejuan, and Stanley robbed the Arvest Bank.

six banks under a global conspiracy theory for which the majority concedes there is no evidentiary support.[3] *Cf. Carnagie*, 533 F.3d at 1243 (holding that a defendant was not prejudiced where the jury illustrated that it could compartmentalize the evidence associated with each defendant where it acquitted some defendants on some charges). But the jury's confusion is easy to understand in the context of the record as a whole.

Under the guise of prosecuting a global conspiracy orchestrated by the Hoover Crips gang, the government subjected Dejuan to a three-week trial, during which it elicited testimony from over sixty witnesses and admitted into evidence almost two-hundred exhibits. Only a small fraction of this evidence related to Dejuan or his alleged participation in the Arvest Bank robbery. *See United States v. Dellosantos*, 649 F.3d 109, 125 (1st Cir. 2011) ("[T]here should be little question that the jury's decision to find the Defendants guilty . . . was influenced by the plethora of evidence implicating the other sixteen indicted co-defendants . . . in a [separate] conspiracy . . . . As previously

---

[3] The confusion of the jury is highlighted by the fact that the government's evidence actually refuted the existence of a global conspiracy. For example, the evidence established that the alleged global coconspirators are all members of different sets of the Hoover Crips gang. Yet the government's witness, a former Hoover Crips gang member, testified that each set operates within itself, and there is no individual at the top who has control over multiple sets. He also explained that if the members of a particular set committed a robbery, they would be unlikely to share that money with anyone outside their set or to give it to someone who might be higher in the organization. *Cf. United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (recognizing that interdependence is a required element in conspiracy and that "[i]nterdependence exists where coconspirators intend to act together for their shared mutual benefit within the scope of the conspiracy charged").

mentioned, this evidence included direct testimony from various co-defendants . . . and a selection of hundreds of telephone conversations (from a pool of thousands of calls intercepted by the government) involving hours of intercepted communications."); *United States v. Camiel*, 689 F.2d 31, 38 (3d Cir. 1982) (finding a prejudicial variance where the "volume and manner of presentation of the evidence created the likelihood of spillover: i.e., that the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another"); *cf. United States v. Harrison*, 942 F.2d 751, 758 (10th Cir. 1991) (concluding there was no prejudicial spillover where the evidence regarding other conspiracies in which the defendant was not involved was "sufficiently narrow and insignificant compared to the overwhelming evidence offered with respect to the conspiracy" in which the defendant was involved).

The risk of prejudice to Dejuan due to the admission of irrelevant evidence related to the global conspiracy was compounded because much of that evidence is inherently prejudicial in nature. For example, the government presented considerable gang evidence of questionable relevance to the Arvest Bank robbery, which, in my view, increased the risk that the jury imputed guilt to Dejuan based on the actions of others. *See United States v. Archuleta*, 737 F.3d 1287, 1295 (10th Cir. 2013), *cert. denied*, 134 S. Ct. 2859 (2014) ("Any unfairness from gang-affiliation testimony stems from the implicit connection [drawn] between the crimes committed by gangs and the defendant gang member. In

most cases, concern about such innuendo would be proper, because ordinarily the jury should not assume that the defendant gang member committed the [gang's] crimes."); *United States v. Santiago*, 643 F.3d 1007, 1011 (7th Cir. 2011) (juries are "likely to associate gangs with criminal activity and deviant behavior, such that the admission of gang evidence raises the specter of guilt by association or a verdict influenced by emotion." (internal quotation marks omitted)).

This evidence included testimony from a former Hoover Crips gang member who testified about how the gang operates. Although it seems to have no relevance to the Arvest Bank robbery or the conspiracy to commit that robbery, the witness explained how one becomes a member of the Hoover Crips gang. Specifically, he testified that to become a member of the gang, one can be "jumped in" through a violent gang initiation ritual, or "blessed in" through family members. He then explained that gang members "put work in" or "earn stripes" by committing crimes or retaliating against rival gang members. And although the Arvest Bank robbery did not involve such participants, he also explained that the phrases "little homies" or "baby gangsters" refer to 10-, 11-, or 12-year-old children, whom the gang may use as "crash dummies," to commit crimes where they are likely to be arrested.

At one point, the government had the witness "throw up" the Hoover gang sign for the jury to see and asked him to describe the tattoos on his own body. One tattoo depicts "NK" and "BK," which stand for "Neighborhood Killer" and "Blood Killer,"

respectively. Another tattoo depicts a devil with the word "Hoover" on its chest, holding a machine gun and giving the finger. But there was no evidence these tattoos matched Dejuan's tattoos, or that any gang signs were "thrown" during the Arvest Bank robbery.

In addition, much of the gang evidence presented at trial highlighted the violent nature of the Hoover Crips gang and gang membership generally. Mr. Herron testified that he had to move from Tulsa because his house was "shot up," allegedly by two individuals, neither of whom are claimed to have anything to do with the Arvest Bank robbery. And although there was no suggestion that the Arvest Bank robbery was related to any gang rivalry, the government presented testimony regarding the feud between the Bloods and the Crips gangs and the attendant danger of affiliating with a rival gang. A Tulsa Police Department Officer also testified that the Hoover Crips is one of the more powerful African American gangs in Tulsa. He explained that to "gain respect," members were "required to do criminal activities" such as "shooting at people, doing drives-bys on people's houses on rival gang members, [or] disrespecting rival gang members in public to try to start a fight to show your allegiance to the gang." Another Tulsa Police Department Officer testified that he spent significant time investigating the Hoover Crips because of the "gang problem in Tulsa." This same officer also testified regarding photographs he obtained from a social media website. These photographs, along with other photographs introduced into evidence, depicted various people throwing up gang

signs, holding money in their mouths, and displaying guns. Neither Dejuan, Vernon, nor Stanley, the alleged Arvest Bank robbers, is depicted in any of these photographs.

I do not dispute that the introduction of some gang evidence would be appropriate, even in the absence of a global conspiracy, to prove a smaller conspiracy alleged to involve members of the same gang. *See Archuleta*, 737 F.3d at 1293. But with respect to the Arvest Bank robbery, the evidence of Dejuan's gang affiliation has minimal value. Because Dejuan was alleged to have robbed the bank with his two brothers, Vernon and Stanley, "the jury did not need to rely on the gang-affiliation evidence to find knowledge, purpose, or agreement with his coconspirators." *United States v. [Vernon] Hill*, ___ F. App'x ___, No. 13-5084, Slip. Op. at 41 (10th Cir. May 22, 2015) (unpublished opinion). Indeed, the government did not introduce any evidence that Stanley is a Hoover Crips gang member.

Even if some gang evidence could be relevant to the Arvest Bank robbery, the government's presentation of evidence here went well beyond anything necessary to establish Dejuan's conspiratorial relationship with his brothers Vernon and Stanley. In my opinion, most of the extensive gang evidence admitted had no relevance to the Arvest Bank robbery or the smaller conspiracy to commit that robbery. And because of its inherently shocking and inflammatory nature, I am convinced its admission made it highly likely the jury impermissibly transferred guilt to Dejuan. *See United States v. Johansen*, 56 F.3d 347, 352 (2d Cir. 1995) (concluding a variance was prejudicial where

the defendant was tried with an alleged coconspirator who was reportedly associated with a mobster and had committed several armed robberies and attempted murder); *United States v. Jackson*, 696 F.2d 578, 587 (8th Cir. 1982) (recognizing the danger of guilt by association "was heightened by the inflammatory nature of much of the evidence presented"); *United States v. Bertolotti*, 529 F.2d 149, 158 (2d Cir. 1975) (holding there was a prejudicial variance where the jury spent "two entire days listening to obviously shocking and inflammatory discussions about assault, kidnapping, guns and narcotics" and concluding the prejudicial nature of this evidence "cannot be underestimated. No defendant ought to have a jury which is considering his guilt or innocence hear evidence of this sort absent proof connecting him with the subject matter discussed"); *cf. Archuleta* 737 F.3d at 1295 (concluding a jury's verdict was not unduly swayed by an emotional reaction to gang evidence where the jury parsed the conspiracies charged, finding the defendant guilty of one count in the indictment but not another).

The jury also heard evidence of six robberies that had no relevance to Dejuan in the absence of a global conspiracy. As with the gang evidence, I am convinced the admission of this evidence increased the risk of prejudicial spillover. Unlike the majority, I do not consider the Arvest Bank robbery to be of the "same character" as each of the other robberies. In particular, the Arvest Bank robbery was less violent than the Tulsa Credit Union robbery, in which the robbers tore down security cameras, fired their weapons (narrowly missing one employee), and were physically violent to credit union employees.

- 11 -

Indeed, one credit union employee testified a robber grabbed her with enough force to rip her shirt and break her necklace, dragged her through broken glass to the vault, and held a gun to her head while demanding that she give him money. In contrast, although one of the Arvest Bank robbers pointed a semiautomatic pistol at the customers and bank employees and screamed profanities while ordering them to the ground, no shots were fired and no one was physically assaulted. Thus, even if the robberies, including the Arvest Bank robbery, can be characterized as being executed in a violent takeover style, I view the Tulsa Credit Union robbery as involving a greater degree of violence. *Cf. Carnagie*, 533 F.3d at 1242 (holding that the risk of prejudice was minimized where the transactions not involving defendants were of the "exact same character" as the transactions in which the defendants allegedly participated).

Moreover, to the extent Dejuan is alleged to have played a role in the conspiracy, his role was more limited than his alleged global coconspirators or even his codefendants. By way of comparison, although Dejuan is alleged to have participated in only the Arvest Bank robbery, the government alleged Vernon participated in four and Deandre participated in three robberies. *Cf. id.* at 1243 (holding the risk of prejudice was minimized where the defendants were "charged with conduct of approximately equal culpability." (internal quotation marks omitted)); *Johansen*, 56 F.3d at 352 (concluding there was a prejudicial variance where the defendant's conspiracy involved $7,000–8,000 in credit card fraud but he was tried with unrelated defendants who engaged in over

- 12 -

$250,000 worth of fraudulent transactions). In sum, I would conclude the government's presentation of prejudicial evidence that had little relevance to Dejuan or his participation in the Arvest Bank robbery made it more likely than not the jury impermissibly transferred guilt to Dejuan.[4]

I turn now to consider "the strength or weakness of the evidence underlying the jury's conviction." *Carnagie*, 533 F.3d at 1241. Contrary to the majority, I would conclude the evidence supporting Dejuan's participation in the smaller conspiracy to rob the Arvest Bank was not strong enough to alleviate the risk of prejudicial spillover.

I begin by addressing the majority's analytical framework for examining the strength of the evidence. The majority engaged in a two-part inquiry: first, it determined there is sufficient evidence to convict Dejuan of the smaller conspiracy to rob the Arvest Bank; second, it "consider[ed] whether the evidence of the [smaller] conspiracy in which Dejuan was implicated was so much weaker than the evidence introduced regarding the

---

[4] The majority concludes that the risk of prejudice from this largely irrelevant evidence must not have been great because "Dejuan did not object to the introduction of much of the evidence introduced to support the global conspiracy." But Dejuan did object to the use of evidence related to the global conspiracy in which he played no role. Before trial, he argued that he should not be joined with the other defendants under Federal Rule of Criminal Procedure 8 because he was not a part of the global conspiracy (a point on which Dejuan was ultimately correct). He also argued that even if joinder was proper, the court should sever his trial because the evidence related to the global conspiracy would be unfairly prejudicial. The court rejected his arguments. Once it did so, all evidence related to the global conspiracy was relevant and admissible in the joint trial, making further objection futile. It is for precisely this reason that we must be "vigilant" in determining whether the government's decision to charge a global conspiracy, which it fails to prove at trial, has prejudiced a defendant. *See United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992).

larger conspiracy that a substantial, prejudicial spillover must have resulted." I agree with the first premise: the evidence tying Dejuan to the uncharged, smaller conspiracy to rob the Arvest Bank satisfied our traditional sufficiency of the evidence standards when viewed in the light most favorable to the government. But I do not agree with the majority's second analytical step, which would require the evidence introduced with respect to the Arvest Bank robbery to be "so much weaker" than the evidence of the global conspiracy that prejudicial spillover "must" have occurred. In my view, the strength or weakness of the evidence that would support a conviction for conspiracy to rob the Arvest Bank is merely one of the three factors we consider to determine "if the evidence adduced against co-conspirators involved in separate conspiracies was *more likely than not* imputed to the defendant by the jury in its determination of the defendant's guilt." *Carnagie*, 533 F.3d at 1241 (emphasis added) (internal quotation marks omitted). I would conclude the weakness of the evidence supporting Dejuan's participation in the Arvest Bank robbery weighs in favor of a conclusion that the jury more likely than not imputed guilt to Dejuan from evidence adduced against the alleged global coconspirators.

Under *Harrison*, we compare the amount or quantity of evidence admitted regarding the irrelevant conspiracies to the amount of evidence related to the conspiracy in which the defendant participated. 942 F.2d at 758. Where the evidence admitted regarding the irrelevant conspiracies is "sufficiently narrow and insignificant" compared to an

- 14 -

"overwhelming" amount of evidence offered with respect to the conspiracy in which the defendant is a member, *Harrison* instructs there is unlikely to be a prejudicial spillover. *Compare id.* at 758–59, *and United States v. Edwards*, 69 F.3d 419, 433 (10th Cir. 1995) (no prejudice where there was "ample evidence" establishing a single conspiracy), *with Dellosantos*, 649 F.3d at 125 (determining there was a prejudicial spillover where the jury's decision was influenced by "the plethora" of evidence related to a separate conspiracy), *and Camiel*, 689 F.2d at 38 (finding a prejudicial variance where there was a significant amount of irrelevant evidence admitted with respect to the separate conspiracies).

In addition to weighing the quantity of relevant versus irrelevant evidence, we may also consider the quality of that relevant evidence; i.e., whether the relevant evidence presents compelling evidence of the defendant's guilt. *See Gallegos*, 2015 WL 1935223, at *5 (holding that we focus on "the possibility of jury confusion and the strength of the evidence proving the defendant's involvement in the smaller conspiracy"); *Harrison*, 942 F.2d at 758–59 (holding that in addition to being overwhelming in terms of volume, the evidence of the defendant's involvement in the smaller conspiracy was consistent with testimony from the defendant's coconspirators and corroborated by extrinsic evidence). The more compelling the evidence of a defendant's guilt with respect to the smaller conspiracy, the less likely it is he was prejudiced by the admission of irrelevant and inflammatory information related to the larger conspiracy. *See, e.g.*, *Gallegos*, 2015 WL

- 15 -

1935223, at *5 (holding that a variance was not prejudicial where there was "overwhelming evidence" establishing defendant's involvement in the smaller conspiracy); *Carnagie*, 533 F.3d at 1244 & n.8 (concluding there was no prejudice where the jury heard "ample evidence" that was "more than sufficient" to convict both defendants of the smaller conspiracies); *United States v. Morris*, 623 F.2d 145, 151 (10th Cir. 1980) (concluding there was no prejudicial spillover where there was a "strong showing of guilt"); *United States v. Geibel*, 369 F.3d 682, 694 (2d Cir. 2004) (holding that defendants were not prejudiced by the introduction of evidence related to a larger conspiracy where there was "overwhelming" evidence of involvement in a smaller conspiracy); *Andrews v. United States*, 108 F.2d 511, 515 (4th Cir. 1939) (no prejudicial variance where evidence of guilt was "so overwhelming that it is not possible that [defendants'] cause could have been prejudiced before the jury by the evidence" of a separate conspiracy); *cf. United States v. Rosnow*, 977 F.2d 399, 408 (8th Cir. 1992) (concluding a variance was prejudicial where, among other factors, there was a "lack of overwhelming evidence of guilt").

Examining the strength of the evidence under this lens leaves me with the conviction that the variance was prejudicial in this case. First, as previously discussed, in an attempt to prove a global conspiracy, the government introduced an overwhelming amount of evidence that was largely irrelevant to the Arvest Bank robbery. Second, there was a relatively small amount of evidence linking Dejuan to either the Hoover Crips gang or to

- 16 -

the Arvest Bank robbery. This significant disparity created a great risk of prejudicial spillover.[5] And, for the reasons explained below, I am not convinced the relevant evidence linking Dejuan to the conspiracy to rob the Arvest Bank was strong enough to make the risk of prejudice unlikely.

The majority has thoroughly and thoughtfully considered the sufficiency of the evidence related to Dejuan's participation in the Arvest Bank robbery, and I see no need to reexamine it in full. As explained, I concur in the majority's conclusion that the evidence, when viewed in the light most favorable to the government, would be sufficient to support a verdict, entered after a fair trial, finding Dejuan guilty of robbing the Arvest Bank. It would also be sufficient to establish that he entered into a smaller conspiracy to rob the Arvest Bank. But I take this opportunity to highlight some of the weaknesses and inconsistencies in the evidence connecting Dejuan to the Arvest Bank robbery to illustrate why I do not consider the evidence strong enough to render the risk of prejudicial spillover unlikely. *See Kotteakos*, 328 U.S. at 765 ("The inquiry cannot be

---

[5] The majority concedes there was an overwhelming amount of evidence admitted that had little relevance to Dejuan, but contends the admission of this evidence actually benefitted Dejuan by allowing him to compare his behavior to that of more culpable defendants. Specifically, the majority claims "a reasonable jury might wonder whether Dejuan was really involved in the Arvest Bank robbery considering the dearth of evidence that he was involved in the other criminal activity." It is true that Dejuan tried to minimize the impact of the prejudicial evidence by accurately arguing in closing that the government had put on very little evidence tying him to the global conspiracy or the Arvest Bank robbery. But I do not agree this weighs against a finding of prejudice. Despite the dearth of evidence admitted to prove a global conspiracy, the jury found one existed and that Dejuan participated in it. Thus, notwithstanding counsel's best efforts, the jury was obviously confused in a manner that prejudiced Dejuan.

merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.").

As the majority recognizes, there is no direct evidence implicating Dejuan in the Arvest Bank robbery. Thus, connecting him to the robbery requires several inferential steps taken from circumstantial evidence. Although a conviction can be based on reasonable inferences drawn from circumstantial evidence, the inferences here do little more than meet the minimum requirements of sufficiency. *Cf. United States v. Summers*, 414 F.3d 1287, 1296 (10th Cir. 2005) (holding that the multiple inferences required to support the defendant's guilt were too attenuated from the evidence to support his conviction for conspiracy to commit bank robbery).

For example, the government's theory of the case relies on the inference that three individuals were involved in the Arvest Bank robbery: Vernon and Dejuan, who physically entered the bank, and Stanley, who acted as the getaway driver. But none of the witnesses observed more than two robbers. Thus, the key piece of evidence supporting this theory is Officer Johnson's identification of Dejuan driving on an alley leading away from 1107 E. Pine Street (the Hill residence) shortly after the robbery. The government argues the evidence of Dejuan's presence in the alley compels the conclusion that Dejuan robbed the Arvest Bank with Vernon and Stanley and the three of them entered the house after the robbery. Even if we assume Officer Johnson's identification of Dejuan—which occurred three-and-a-half months after Officer Johnson's two-second

- 18 -

observation of the individual in the Nissan—is reliable, the strength of this evidence is limited by the timeline established at trial. The Arvest Bank robbery occurred at approximately 8:30 a.m., and the money came to rest in the vicinity of the Hill residence at approximately 8:44 a.m. Officer Johnson testified he arrived at the Hill residence one minute later, at approximately 8:45 a.m., and that other law enforcement officers were present at that time establishing a perimeter around the house. Officer Johnson then observed Dejuan driving out of the alley at around 9:00 a.m. But despite the fact that law enforcement officers were present and observing the house for approximately fifteen minutes before Dejuan drove out of the alley, no one saw Dejuan leave the house. This leads to either of two conclusions: Dejuan was not inside the house in the first place, or it was possible to leave the house without notice, "despite the presence of numerous police officers in the vicinity."

It is apparent the government did not have confidence in the second possible conclusion—that an individual involved in the Arvest Bank robbery left the house undetected—because it initially tried only Vernon and Stanley for the robbery. And during that trial, the prosecutor told the jury: "I submit to you the testimony has been unrefuted that no one came or went to [the house] other than these two defendants. . . . No one else. The testimony was unrefuted." *United States v. [Vernon] Hill*, 737 F.3d 683, 685 (10th Cir. 2013), *cert. denied*, 134 S. Ct. 1905 (2014). She elaborated, "[y]ou might listen for argument regarding this mysterious car that was seen in the area of [the

house] . . . Officer Johnson testified that, one, he wasn't the first person on the scene. So think about the point in time when he arrived. Certainly a perimeter had already been established. You heard testimony from officers who said that they had it on-point, they were watching that back door. Didn't see anyone come or go until [Vernon and Stanley] came out." *Id.* Thus, even the government has recognized that Dejuan's presence in the Nissan on an alley by the Hill residence shortly after the robbery is weak evidence of his presence inside the house. And, even if we assume that Dejuan was present inside, his mere presence in the house where his family members lived is insufficient to establish his guilt for robbing the Arvest Bank. *See Summers*, 414 F.3d at 1296.

The majority concludes the lack of direct evidence that Dejuan was involved in the robbery is overcome by his presence in the alley, coupled with the cell phone records for Landrum 1 and Landrum 2. According to the majority, these cell phone records establish that there were three people involved in the robbery and that one of those people was Dejuan. The theory works like this: Stanley and Dejuan both had access to Landrum 1 and Landrum 2. These two phones, along with Vernon's phone, were all in the same location (the government suggests at Ms. Landrum's house) shortly before the robbery, indicating that the users of these phones met up before the robbery. Then, immediately before the robbery, Landrum 2 was turned off, which the government implies indicates that one of the robbers (presumably Dejuan) turned the phone off during the commission of the robbery. In addition, Vernon's cell phone called Landrum 1 immediately before the

robbery, from which the government infers Vernon called the getaway driver (presumed to be Stanley), who was then in possession of Landrum 1. The government offered no direct evidence that either Stanley or Dejuan used Landrum 1 or 2 on the morning of the Arvest Bank robbery. But the majority concludes Dejuan can be linked to Landrum 1 because Landrum 1 called Vernon's cell phone at about the time Officer Johnson saw Dejuan turn out of the alley and proceed in a southern direction and the cell phone records indicate Landrum 1 was also moving south at that time. I am not persuaded this evidence so strongly implicates Dejuan in the Arvest Bank robbery that it made the possibility of prejudicial spillover unlikely.

First, the location of the cell phones was imprecise. Although the involvement of a particular cell tower indicates a general location of the cell phone user, the user could be anywhere within a multiple-block area. And the cell phone records do not reflect who used a particular phone or what was said in any particular conversation. Thus, it is possible that someone other than Dejuan or Stanley could have been using either cell phone at any given time, and for purposes related or unrelated to the robbery. Indeed, even the government seemed confused about what can be inferred from the cell phone records.

At trial, the government first argued that one of the robbers who entered the bank (presumably Dejuan) must have used Landrum 2 because it was turned off during the robbery. The government next asserted Vernon used his own cell phone and that his call

prior to the robbery was to contact a getaway driver (presumably Stanley), who used Landrum 1. But if Dejuan was the second robber who actually entered the Arvest Bank as the government argued, that would put him in possession of Landrum 2—the phone turned off immediately before the robbery—not Landrum 1, the phone used by the getaway driver. However, the cell phone that called Vernon's cell phone while traveling south at about the time Officer Johnson saw Dejuan in the Nissan is Landrum 1. Thus, in addition to inferring all of the other facts linking Dejuan to the robbery, we must also infer that he entered the house briefly, obtained Landrum 1 from Stanley, exited the home without being observed by any of the police officers surrounding it, and then called Vernon on Landrum 1 to warn him of the police presence. While this may be true, it requires considerable effort by the jury to fill in the significant gaps in the evidence. In my opinion, this rendered the evidence weak enough that the glut of irrelevant and prejudicial evidence about the nonexistent global conspiracy more likely than not improperly influenced the jury's verdict.

The government and the majority also rely on evidence of the physical description of the two robbers who entered the bank to place Dejuan in the bank and to exclude Stanley as the second robber. In particular, the government contends the testimony concerning the relative skin tone and height of the suspects is compelling evidence supporting the conclusion that Dejuan robbed the Arvest Bank. I am not convinced. First, if the eyewitness testimony and surveillance footage so clearly eliminated Stanley as a suspect,

it seems odd that the government first prosecuted, albeit unsuccessfully, Stanley as the second robber who entered the bank with Vernon. *See United States v. [Stanley] Hill*, 749 F.3d 1250, 1252 (10th Cir. 2014) (recognizing that the government initially tried Stanley for bank robbery under the theory that Vernon and Stanley physically entered the bank). Second, a careful examination of the evidence related to the robbers' skin tone and height belies the suggestion that it was sufficiently strong to negate the risk of prejudicial spillover. Because the robbers wore masks, long sleeves, and gloves, only small parts of their skin were visible. Although one eyewitness testified that in his subjective opinion one of the robbers had a darker skin tone and the other had a lighter skin tone, three other eye witnesses were unable to distinguish between the robbers' skin tone. In fact, one eyewitness testified that the masks made the robbers' skin appear darker than it likely was, which calls into question the reasonableness of the inference that Stanley's "medium" skin tone is not dark enough to match the second robber. Another witness testified she could not see any skin showing—not even enough to identify the robbers' race, while a third testified she didn't notice the robbers' skin color. Accordingly, the evidence was less than compelling concerning the relative skin tones of the robbers.

The evidence that Dejuan matches the height of the second robber while Stanley does not is also problematic. It is based exclusively on an FBI agent's comparison of the height of the teller counter with the agent's assumptions about the height of the second robber, based on the surveillance video's recording of the second robber jumping over the

counter. Based on this comparison, the agent estimated the second robber's height between 5'8" and 5'11" tall. The same agent opined that Stanley is 5'6" to 5'7" tall. Even if we accept the accuracy of these estimates, Stanley is within one inch of the height range estimated for the robber. In my view, this is not a great enough discrepancy that he can be excluded as the second robber based on his height. Nor can Dejuan be strongly implicated as the second robber based on the fact that he is taller than Stanley.[6] The agent's estimate of the second robber's height, which spans three inches, is hardly conclusive evidence that Dejuan was involved. And it was not the only evidence presented to the jury about the height of the Arvest Bank robbers. A witness who observed the robbers fleeing on foot after the robbery reported to the FBI that they were 6'0" and 6'2" tall, respectively. This would make both robbers taller than Dejuan (and much taller than the agent estimated the second robber to be).

But even if Stanley could be eliminated as one of the robbers who entered the bank based on his height or skin tone, it does not identify the second robber as Dejuan. Many African-American men undoubtedly have "darker" skin and stand between 5'8" and 5'11" tall. And some of the men who meet both of those criteria may also be members of the Hoover Crips gang or have other connections to Vernon and/or Stanley. Indeed, Vernon was accused of conspiring to rob the Metro and CVS pharmacies with multiple

---

[6] There was no evidence introduced at trial regarding Dejuan's actual height, although he was present and could be observed by the jury. Information in the record indicates that Dejuan is 5'10" tall.

people who may fit the general description. Therefore, even if it can be reasonably inferred that a third person participated in the Arvest Bank robbery, the height or skin tone evidence does not strongly identify Dejuan as that person.

Finally, the strength of the evidence related to the robbers' respective identity based on their skin tone and height is debatable because the government posited inconsistent theories at trial regarding the roles that the lighter-skinned or darker-skinned robber played during the robbery. During the Arvest Bank robbery, one of the robbers stayed in the lobby holding the victims at gunpoint while the other robber jumped over the teller counter to collect the cash. The one eyewitness who claimed he could distinguish between the robbers based on their relative skin tones testified the darker skin-toned robber (allegedly Dejuan) jumped behind the teller counter while the lighter skinned-toned individual (allegedly Vernon) stayed on the other side controlling the victims. The government made much of this fact in opening arguments, stating the evidence would show that Vernon held the victims at gunpoint while "Dejuan Hill mounts the teller counter, jumps over the counter, and begins collecting money." Later, however, the government contradicted its own theory. It showed the jury a video of a masked robber (alleged to be Vernon) leaping over the counter of the Metro Pharmacy, and then argued this person was the exact same person who jumped over the counter during the Arvest Bank robbery. The prosecutor explained in closing argument, "If you're a football fan and you have a favorite running back, you can tell their style. Look at Vernon Hill's style

of running. You look at that . . . . And when you see him leap the counter in the Metro Pharmacy robbery, it is exactly the same as the person who leaps the counter in the Arvest robbery." But if the skin tone and height of the second robber is compelling evidence of Dejuan's involvement, it is compelling evidence that he, not Vernon, jumped over the counter during the Arvest Bank robbery. Where even the government exhibited confusion regarding which brother played which role in the robbery, I am convinced the jury more likely than not confused the evidence as well. For these reasons, I would conclude that the skin tone and height identification evidence related to the second robber provides only weak evidence of Dejuan's guilt.

Finally, I address the fact that law enforcement officers searching the Hill residence located only one set of clothing worn by the robbers. The majority adopts the government's current theory that the absence of a second set of clothing in the Hill residence strongly indicates Dejuan was wearing the second set when he drove away. But here too, the evidence is weaker than the government acknowledges. Although law enforcement officers found one hoodie, one ski mask, and one pair of black pants in the house, officers also found two pairs of black gloves and numerous generic gray and black tee shirts matching the description of the clothes worn by the second robber. Thus, the government's characterization of this evidence as establishing that the officers executing

the search warrant found only one set of robber's clothing is generous.[7] Even if the government is correct and only one set of the clothes worn by the robbers was found at the Hill residence, the inference that Dejuan was wearing the clothes when he drove past Officer Johnson is merely one reasonable possibility. It could just as easily mean the second robber never went to the house in the first instance. Again, the jury was required to make numerous inferences to convict Dejuan. In my view, this created a high likelihood that the jury would be improperly influenced by the overwhelming and prejudicial evidence unrelated to the Arvest Bank robbery.

In summary, I would conclude the prejudicial evidence admitted under the guise of prosecuting a global conspiracy and the weakness of the evidence connecting Dejuan to the Arvest Bank robbery indicate the variance substantially prejudiced Dejuan's right to a fair trial. As a result, I would remand to the district court for a new trial.

---

[7] The compelling nature of this evidence is also undermined by the fact that when prosecuting Stanley for robbing the Arvest Bank, the government considered the clothing found in the home to be consistent with their theory that only Vernon and Stanley had participated in the Arvest Bank robbery. *See United States v. [Vernon] Hill*, 737 F.3d 683, 685 (10th Cir. 2013) *cert. denied*, 134 S. Ct. 1905 (2014) (the prosecutor reminded the jury that Vernon and Stanley must have been the same two men who robbed the bank because officers found items in the house that were consistent with items worn by the robbers).